<u>United States District Court</u>
<u>District of Connecticut</u>



<u>Plaintiff</u>
JOSE GARCIA:                                                              Case No.3:22-cv-1328 (SVN)

                                         :

                                         :

  v.                                     :

                                       :

Defendants                        :          May 30,2023
STATE OF CONNECTICUT           :
DEPARTMENT OF CORRECTIONS (DOC)  :
Darren Chevalier  Captain Chevelier,      :
Mr McClain or Lieutenant McClain,       :
Mr Clayton or Lieutenant Clayton,
Mr Schold or Lieutenant Schold,
Mr Shachun or Lieutenant Schachun     :
Mr Grant or Corrections Officer Grant,    :
Mr Croke or Corrections Officer Croke,   :
Mr Torres or Corrections Officer Torres,  :
Ms Quinine's or Corrections Officer Quinones,  :
Mr Garutti or Corrections Officer Garutti,   :
Mr Shires or Corrections Officer Shires,   :
Mr Stygall or Corrections Officer Stygall,   :
Mr Ware or Corrections Officer Ware,
Mr Conteras or Corrections Officer Conteras
Mr Ocasio or Corrections Officer Ocasio
Mr Floodquist or Corrections Officer Floodquist  :
Mr John Doe 1 or Corrections Officer Doe 1,    :
Mr John Doe 2 or Corrections Officer Doe 2,    :

Ms Tiffany Dyke or Corrections Nurse Dyke,    :
Ms Melissa Winiarz or Corrections Social Worker Winiarz, and :
Ms Heather Gaw or Corrections Psychologist Gaw :

## <u>AMENDED COMPLAINT</u>

Plaintiff, Jose Garcia, hereby submits the following as his Amended Complaint in the above-captioned action.

## <u>THE PARTIES</u>

### <u>The Plaintiffs (1)</u>

The plaintiff/petitioner, Jose Garcia, is a natural person  an inhabitant of Connecticut -- one of the United States -- and one of the People of Connecticut, in whom all political power is inherent, on whose authority all free governments are founded, and for whose benefit they are instituted who, at all times relevant hereto, was subject to the loss of liberty and confined at Osborn Correctional Institution, a ward of the State of Connecticut under the guardianship and protection of the Department of Corrections (DOC) but who nevertheless possesses full legal

rights and capacity to manage his own affairs and freely exercise and enjoy any, all, and every other inalienable, indefeasible, and inherent right, privilege, or immunity guaranteed, protected, and secured to him by the Constitution for the United States and the State of Connecticut, not subject to the authority of another.

## The Defendants (21)

1.  Defendant STATE OF CONNECTICUT is the creation or product of a social compact -- i.e., the Connecticut Constitution, whose political power is inherent in the People of Connecticut. It is a form of free (self) government founded on their authority and instituted for the benefit of every individual one, being one of the People of Connecticut in order more effectually to define, secure, and perpetuate the liberties, rights and privileges which they have derived from their ancestors and wherein no man [person] or set of men [persons] are entitled to exclusive public privileges (i.e. a right or immunity granted as a peculiar benefit, advantage, or favor granted to some and not others especially attached specifically to a position or an office) from the community.

At all times relevant hereto, the Defendant State of Connecticut --- as an ongoing legal entity capable of holding a legal beneficial interest in property comprised of a regularly interacting or interdependent set of persons combined as to form and function as a unified whole irrespective of their individual identities, that together perform one or more vital functions reasonably necessary and required in order more effectually to define, secure, and perpetuate the liberties, rights, and privileges of each person to each person and thereby provide for the equitable administration of government, justice, and law, with such obligations and powers of government confided to three separate sets of persons (i.e. magistracies -- Executive, Legislative, and Judicial) having or being of the fundamental nature or quality of purpose and design intended to function as vital and inherent checks and balances that provide for their accountability to the People of Connecticut in order to prevent the misconstruction, abuse, or concentration of the powers of government in any one person or set of persons, to protect, uphold, and defend the . . . inherent rights . . . of the People of Connecticut, the Constitution for the United States and of the State of Connecticut and take care that their laws be faithfully executed --- has a long history of being and has long been derelict in their constitutionally imposed duties to supervise or otherwise oversee and provide such minimally-adequate legislation to clearly define and provide even the most fundamentally-essential rules or regulations having or being of the fundamental nature or quality of purpose and design intended to protect the People of Connecticut and their . . . inherent rights . . . from any possible malfeasance, mistakes, or misconduct that might arise in the ordinary course of business of the ongoing operations of the agencies . . . departments . . . offices, etc. they have created or by their agents . . . employees . . . officers, etc. and, relevant to this matter, have instead adhered to a well-established preference to submit or yield, with ingratiating regard, to the judgment and opinions or wishes and whims of the "prison professionals" insisting that "prison officials are to remain the primary arbiters of the problems that arise in prison management" because "the problems of prisons in America are hard to separate, analyze, or solve or are marked by an involvement of many parts, aspects, or details necessitating careful study or attention and are not easily governed, managed, or directed" and, acting upon the misguided notion that because they believe that the Executive, Legislative, and specifically the Judicial offices "are particularly ill-equipped to deal with these problems" they have wantonly promoted and taken a "hands-off" approach and attitude towards the DOC and have allowed them to operate on their own ambiguous, arbitrary, and vague "Administrative Directives" which, in all actuality, amount to nothing more than an over-glorified  system of make-it-up-and-guess-as-you-go practices and procedures which have resulted in the long history of the reasonably-well-known deplorable conditions of Connecticut's prisons that are well below ordinary and reasonable standards of decency or habitability and cause or are conducive to injury, grief, or pain and other such cruel and unusual punishments that are readily-well-known to have persisted as the ordinary course of business throughout the history of Connecticut's DOC.

These willful derelictions of duty and systemic failures that have long been the ordinary course of business in the ongoing operations of the Executive, Legislative, and Judicial offices of the State of Connecticut have frustrated the fair and proper administration of justice, critically impaired the legitimate function of government and are the direct, proximate, and sole cause of the acts, errors, or omissions performed or committed under color of law, office, or badge of authority that subjected or caused this plaintiff/petitioner to be subjected to the deprivation of the free exercise or enjoyment of any of his inalienable, indefeasible, and inherent rights, privileges, and immunities guaranteed, protected, or secured to him by the Constitution for the United States or of the State of Connecticut such as, among others, to be free from such cruel and unusual punishments inflicted upon him by way of such conditions of confinement that are well below ordinary and reasonable standards of decency or habitability and cause or are conducive to injury, grief, or pain.

The STATE OF CONNECTICUT can sue as an ongoing legal entity capable of holding a legal beneficial interest in property . . . functioning as unified whole and can be sued as an ongoing entity . . . functioning as unified whole.

2. Defendant, CONNECTICUT DEPARTMENT OF CORRECTIONS is the creation or product of the General Statutes of Connecticut by an act of legislation by the Connecticut General Assembly as a subset of persons as one of the Executive Offices of Connecticut.

At all times relevant hereto, the Defendant CONNECTICUT DEPARTMENT OF CORRECTIONS --- as an ongoing legal entity capable of holding a legal beneficial interest in property comprised of a regularly interacting or interdependent set of persons combined as to form and function as a unified whole irrespective of their individual identities . . . has long refused, neglected or otherwise failed to establish or enforce proper standards of care for the inmates, staff, and structures.

These willful derelictions of duty and systemic failures that have long been the ordinary course of business in the ongoing operations of the CONNECTICUT DEPARTMENT OF CORRECTIONS have frustrated the fair and proper administration of justice and law, critically impaired the legitimate function of government and are the direct, proximate, and sole cause of the acts, errors, or omissions performed or committed under color of law, office, or badge of authority that subjected or caused this plaintiff/petitioner to be subjected to the deprivation of the free exercise or enjoyment of any of his inalienable, indefeasible, and inherent rights, privileges, and immunities guaranteed, protected, or secured to him by the Constitution for the United States or of the State of Connecticut such as, among others, to be free from such cruel and unusual punishments inflicted upon him by way of such conditions of confinement that are well below ordinary and reasonable standards of decency or habitability and cause or are conducive to injury, grief, or pain.

The DEFENDANT CONNECTICUT DEPARTMENT OF CORRECTIONS can sue as an ongoing legal entity capable of holding a legal beneficial interest in property. . . functioning as unified whole and can be sued as an ongoing entity . . . functioning as unified whole.

3. Defendant Darren Chevalier or Captain Chevalier.
At all times relevant hereto, Defendant Darren Chevalier or Captain Chevalier, was acting under color of law, office, or badge of authority with the semblance, presumption, or pretense of authority sustaining the acts of a public officer which are solely derived from his apparent title to his respective office --- i.e. a Captain of the Connecticut Department of Corrections --- a supervisory position wherein he was immediately and proximately responsible for promoting and providing for the safe, sane, and sanitary conditions of confinement and workplace environment including the physical structure, its equipment, and vital systems as is reasonably necessary and required to ensure healthy, safe, sane, and secure conditions of confinement and habitable living space for the residents and workplace for the staff, at the Osborn Correctional Institution and the acts, errors, and omissions of his subordinate officers when he wantonly, recklessly, or maliciously and at all times willfully engaged in or otherwise performed certain acts, errors, or omissions that are the direct, proximate and sole cause of the conditions or events that subjected or otherwise caused the plaintiff to be subjected to the deprivation of the free exercise or enjoyment of any of his . . . inherent rights . . . such as, among others, those guaranteed, protected, and secured to him as particularly enumerated by Articles I, IV, V, VI, VIII, X, and XIV of the Amendments to the Constitution for the United States and the acts, errors, or omissions were committed under such circumstances, that they could not and would not have occurred but for the fact that the defendant was an official then and there exercising his official powers as a Captain of the Connecticut Department of Corrections clothed with the authority of the State of Connecticut.

4. Defendant Mr. McClain or Lieutenant McClain.
At all times relevant hereto, Defendant, Mr. McClain or Lieutenant McClain, was acting under color of law, office, or badge of authority with the semblance, presumption, or pretense of authority sustaining the acts of a public officer which are solely derived from his apparent title to his respective office --- i.e. a Lieutenant of the Connecticut Department of Corrections --- a supervisory position wherein he was immediately and proximately responsible for promoting and providing for the safe, sane, and sanitary conditions of confinement and workplace environment including the physical structure, its equipment, and vital systems as is reasonably necessary and required to ensure

healthy, safe, sane, and secure conditions of confinement and habitable living space for the residents and workplace for the staff, at the Osborn Correctional Institution and the acts, errors, and omissions of his subordinate officers when he wantonly, recklessly, or maliciously and at all times willfully engaged in or otherwise performed certain acts, errors, or omissions that are the direct, proximate and sole cause of the conditions or events that subjected or otherwise caused the plaintiff to be subjected to the deprivation of the free exercise or enjoyment of any of his . . . inherent rights . . . such as, among others, those guaranteed, protected, and secured to him as particularly enumerated by Articles I, IV, V, VI, VIII, X, and XIV of the Amendments to the Constitution for the United States and the acts, errors, or omissions were committed under such circumstances, that they could not and would not have occurred but for the fact that the defendant was an official then and there exercising his official powers as a Lieutenant of the Connecticut Department of Corrections clothed with the authority of the State of Connecticut.

5. Defendant Mr. Clayton or Lieutenant Clayton.

At all times relevant hereto, Defendant Mr. Clayton or Lieutenant Clayton, was acting under color of law, office, or badge of authority with the semblance, presumption, or pretense of authority sustaining the acts of a public officer which are solely derived from his apparent title to his respective office --- i.e. a Lieutenant of the Connecticut Department of Corrections --- a supervisory position wherein he was immediately and proximately responsible for promoting and providing for the safe, sane, and sanitary conditions of confinement and workplace environment including the physical structure, its equipment, and vital systems as is reasonably necessary and required to ensure healthy, safe, sane, and secure conditions of confinement and habitable living space for the residents and workplace for their coworkers, at the Osborn Correctional Institution and the acts, errors, and omissions of his subordinate officers when he wantonly, recklessly, or maliciously and at all times willfully engaged in or otherwise performed certain acts, errors, or omissions that are the direct, proximate and sole cause of the conditions or events that subjected or otherwise caused the plaintiff to be subjected to the deprivation of the free exercise or enjoyment of any of his . . . inherent rights . . . such as, among others, those guaranteed, protected, and secured to him as particularly enumerated by Articles I, IV, V, VI, VIII, X, and XIV of the Amendments to the Constitution for the United States and the acts, errors, or omissions were committed under such circumstances, that they could not and would not have occurred but for the fact that the defendant was an official then and there exercising his official powers as a Lieutenant of the Connecticut Department of Corrections clothed with the authority of the State of Connecticut.

6. Defendant Mr. Clayton or Lieutenant Schold.

At all times relevant hereto, Defendant Mr. Schold or Lieutenant Schold, was acting under color of law, office, or badge of authority with the semblance, presumption, or pretense of authority sustaining the acts of a public officer which are solely derived from his apparent title to his respective office --- i.e. a Lieutenant of the Connecticut Department of Corrections --- a supervisory position wherein he was immediately and proximately responsible for promoting and providing for the safe, sane, and sanitary conditions of confinement and workplace environment including the physical structure, its equipment, and vital systems as is reasonably necessary and required to ensure healthy, safe, sane, and secure conditions of confinement and habitable living space for the residents and workplace for their coworkers, at the Osborn Correctional Institution and the acts, errors, and omissions of his subordinate officers when he wantonly, recklessly, or maliciously and at all times willfully engaged in or otherwise performed certain acts, errors, or omissions that are the direct, proximate and sole cause of the conditions or events that subjected or otherwise caused the plaintiff to be subjected to the deprivation of the free exercise or enjoyment of any of his . . . inherent rights . . . such as, among others, those guaranteed, protected, and secured to him as particularly enumerated by Articles I, IV, V, VI, VIII, X, and XIV of the Amendments to the Constitution for the United States and the acts, errors, or omissions were committed under such circumstances, that they could not and would not have occurred but for the fact that the defendant was an official then and there exercising his official powers as a Lieutenant of the Connecticut Department of Corrections clothed with the authority of the State of Connecticut.

7. Defendant Mr. Schachum or Lieutenant Schachum.

At all times relevant hereto, Defendant Mr. Schachum or Lieutenant Schachum, was acting under color of law, office, or badge of authority with the semblance, presumption, or pretense of authority sustaining the acts of a public officer which are solely derived from his apparent title to his respective office --- i.e. a Lieutenant of the Connecticut Department of Corrections --- a supervisory position wherein he was immediately and proximately responsible for promoting and providing for the safe, sane, and sanitary conditions of confinement and workplace environment including the physical structure, its equipment, and vital systems as is reasonably necessary and required to ensure healthy, safe, sane, and secure conditions of confinement and habitable living space for the residents and workplace for their coworkers, at the Osborn Correctional Institution and the acts, errors, and omissions of his subordinate

officers when he wantonly, recklessly, or maliciously and at all times willfully engaged in or otherwise performed certain acts, errors, or omissions that are the direct, proximate and sole cause of the conditions or events that subjected or otherwise caused the plaintiff to be subjected to the deprivation of the free exercise or enjoyment of any of his . . . inherent rights . . . such as, among others, those guaranteed, protected, and secured to him as particularly enumerated by Articles I, IV, V, VI, VIII, X, and XIV of the Amendments to the Constitution for the United States and the acts, errors, or omissions were committed under such circumstances, that they could not and would not have occurred but for the fact that the defendant was an official then and there exercising his official powers as a Lieutenant of the Connecticut Department of Corrections clothed with the authority of the State of Connecticut.

   8.  Defendant Mr. Grant or Correctional Officer Grant.
   At all times relevant hereto, Defendant Mr. Grant or Correctional Officer Grant, was acting under color of law, office, or badge of authority with the semblance, presumption, or pretense of authority sustaining the acts of a public officer which are solely derived from his apparent title to his respective office --- i.e. a Corrections Officer of the Connecticut Department of Corrections --- a supervisory position wherein he was immediately and proximately responsible for promoting and providing for the safe, sane, and sanitary conditions of confinement and workplace environment including the physical structure, its equipment, and vital systems as is reasonably necessary and required to ensure healthy, safe, sane, and secure conditions of confinement and habitable living space for the residents and workplace for their coworkers, at the Osborn Correctional Institution and the acts, errors, and omissions of his fellow officers when he wantonly, recklessly, or maliciously and at all times willfully engaged in or otherwise performed certain acts, errors, or omissions that are the direct, proximate and sole cause of the conditions or events that subjected or otherwise caused the plaintiff to be subjected to the deprivation of the free exercise or enjoyment of any of his . . . inherent rights . . . such as, among others, those guaranteed, protected, and secured to him as particularly enumerated by Articles I, IV, V, VI, VIII, X, and XIV of the Amendments to the Constitution for the United States and the acts, errors, or omissions were committed under such circumstances, that they could not and would not have occurred but for the fact that the defendant was an official then and there exercising his official powers as a Corrections Officer of the Connecticut Department of Corrections clothed with the authority of the State of Connecticut.

   9.  Defendant Mr. Croke or Correctional Officer Croke.
   At all times relevant hereto, Defendant Mr. Croke or Correctional Officer Croke, was acting under color of law, office, or badge of authority with the semblance, presumption, or pretense of authority sustaining the acts of a public officer which are solely derived from his apparent title to his respective office --- i.e. a Corrections Officer of the Connecticut Department of Corrections --- a supervisory position wherein he was immediately and proximately responsible for promoting and providing for the safe, sane, and sanitary conditions of confinement and workplace environment including the physical structure, its equipment, and vital systems as is reasonably necessary and required to ensure healthy, safe, sane, and secure conditions of confinement and habitable living space for the residents and workplace for their coworkers, at the Osborn Correctional Institution and the acts, errors, and omissions of his fellow officers when he wantonly, recklessly, or maliciously and at all times willfully engaged in or otherwise performed certain acts, errors, or omissions that are the direct, proximate and sole cause of the conditions or events that subjected or otherwise caused the plaintiff to be subjected to the deprivation of the free exercise or enjoyment of any of his . . . inherent rights . . . such as, among others, those guaranteed, protected, and secured to him as particularly enumerated by Articles I, IV, V, VI, VIII, X, and XIV of the Amendments to the Constitution for the United States and the acts, errors, or omissions were committed under such circumstances, that they could not and would not have occurred but for the fact that the defendant was an official then and there exercising his official powers as a Corrections Officer of the Connecticut Department of Corrections clothed with the authority of the State of Connecticut.

   10.  Defendant Mr. Torres or Correctional Officer Torres. At all times relevant hereto, Defendant Mr. Torres or Correctional Officer Torres, was acting under color of law, office, or badge of authority with the semblance, presumption, or pretense of authority sustaining the acts of a public officer which are solely derived from his apparent title to his respective office --- i.e. a Corrections Officer of the Connecticut Department of Corrections --- a supervisory position wherein he was immediately and proximately responsible for promoting and providing for the safe, sane, and sanitary conditions of confinement and workplace environment including the physical structure, its equipment, and vital systems as is reasonably necessary and required to ensure healthy, safe, sane, and secure conditions of confinement and habitable living space for the residents and workplace for their coworkers, at the

Osborn Correctional Institution and the acts, errors, and omissions of his fellow officers when he wantonly, recklessly, or maliciously and at all times willfully engaged in or otherwise performed certain acts, errors, or omissions that are the direct, proximate and sole cause of the conditions or events that subjected or otherwise caused the plaintiff to be subjected to the deprivation of the free exercise or enjoyment of any of his . . . inherent rights . . . such as, among others, those guaranteed, protected, and secured to him as particularly enumerated by Articles I, IV, V, VI, VIII, X, and XIV of the Amendments to the Constitution for the United States and the acts, errors, or omissions were committed under such circumstances, that they could not and would not have occurred but for the fact that the defendant was an official then and there exercising his official powers as a Corrections Officer of the Connecticut Department of Corrections clothed with the authority of the State of Connecticut.

11.  Defendant Ms. Quinones or Correctional Officer Quinones.

At all times relevant hereto, Defendant Ms. Quinones or Correctional Officer Quinones, was acting under color of law, office, or badge of authority with the semblance, presumption, or pretense of authority sustaining the acts of a public officer which are solely derived from her apparent title to her respective office --- i.e. a Corrections Officer of the Connecticut Department of Corrections --- a supervisory position wherein she was immediately and proximately responsible for promoting and providing for the safe, sane, and sanitary conditions of confinement and workplace environment including the physical structure, its equipment, and vital systems as is reasonably necessary and required to ensure healthy, safe, sane, and secure conditions of confinement and habitable living space for the residents and workplace for their coworkers, at the Osborn Correctional Institution and the acts, errors, and omissions of her fellow officers when she wantonly, recklessly, or maliciously and at all times willfully engaged in or otherwise performed certain acts, errors, or omissions that are the direct, proximate and sole cause of the conditions or events that subjected or otherwise caused the plaintiff to be subjected to the deprivation of the free exercise or enjoyment of any of his . . . inherent rights . . . such as, among others, those guaranteed, protected, and secured to him as particularly enumerated by Articles I, IV, V, VI, VIII, X, and XIV of the Amendments to the Constitution for the United States and the acts, errors, or omissions were committed under such circumstances, that they could not and would not have occurred but for the fact that the defendant was an official then and there exercising her official powers as a Corrections Officer of the Connecticut Department of Corrections clothed with the authority of the State of Connecticut.

12. Defendant Mr. Garutti or Correctional Officer Garutti.

At all times relevant hereto, Defendant Mr. Garutti or Correctional Officer Garutti, was acting under color of law, office, or badge of authority with the semblance, presumption, or pretense of authority sustaining the acts of a public officer which are solely derived from his apparent title to his respective office --- i.e. a Corrections Officer of the Connecticut Department of Corrections --- a supervisory position wherein he was immediately and proximately responsible for promoting and providing for the safe, sane, and sanitary conditions of confinement and workplace environment including the physical structure, its equipment, and vital systems as is reasonably necessary and required to ensure healthy, safe, sane, and secure conditions of confinement and habitable living space for the residents and workplace for their coworkers, at the Osborn Correctional Institution and the acts, errors, and omissions of his fellow officers when he wantonly, recklessly, or maliciously and at all times willfully engaged in or otherwise performed certain acts, errors, or omissions that are the direct, proximate and sole cause of the conditions or events that subjected or otherwise caused the plaintiff to be subjected to the deprivation of the free exercise or enjoyment of any of his . . . inherent rights . . . such as, among others, those guaranteed, protected, and secured to him as particularly enumerated by Articles I, IV, V, VI, VIII, X, and XIV of the Amendments to the Constitution for the United States and the acts, errors, or omissions were committed under such circumstances, that they could not and would not have occurred but for the fact that the defendant was an official then and there exercising his official powers as a Corrections Officer of the Connecticut Department of Corrections clothed with the authority of the State of Connecticut.

13. Defendant Mr. Stygall or Correctional Officer Stygall.

At all times relevant hereto, Defendant Mr. Stygall or Correctional Officer Stygall, was acting under color of law, office, or badge of authority with the semblance, presumption, or pretense of authority sustaining the acts of a public officer which are solely derived from his apparent title to his respective office --- i.e. a Corrections Officer of the Connecticut Department of Corrections --- a supervisory position wherein he was immediately and proximately responsible for promoting and providing for the safe, sane, and sanitary conditions of confinement and workplace environment including the physical structure, its equipment, and vital systems as is reasonably necessary and

required to ensure healthy, safe, sane, and secure conditions of confinement and habitable living space for the residents and workplace for their coworkers, at the Osborn Correctional Institution and the acts, errors, and omissions of his fellow officers when he wantonly, recklessly, or maliciously and at all times willfully engaged in or otherwise performed certain acts, errors, or omissions that are the direct, proximate and sole cause of the conditions or events that subjected or otherwise caused the plaintiff to be subjected to the deprivation of the free exercise or enjoyment of any of his . . . inherent rights . . . such as, among others, those guaranteed, protected, and secured to him as particularly enumerated by Articles I, IV, V, VI, VIII, and XIV of the Amendments to the Constitution for the United States and the acts, errors, or omissions were committed under such circumstances, that they could not and would not have occurred but for the fact that the defendant was an official then and there exercising his official powers as a Corrections Officer of the Connecticut Department of Corrections clothed with the authority of the State of Connecticut.


   14. Defendant Mr. Shires or Corrections Officer Shires.
   At all times relevant hereto, Defendant Mr. Shires or Corrections Officer Shires, was acting under color of law, office, or badge of authority with the semblance, presumption, or pretense of authority sustaining the acts of a public officer which are solely derived from his apparent title to his respective office --- i.e. a Corrections Officer of the Connecticut Department of Corrections --- a supervisory position wherein he was immediately and proximately responsible for promoting and providing for the safe, sane, and sanitary conditions of confinement and workplace environment including the physical structure, its equipment, and vital systems as is reasonably necessary and required to ensure healthy, safe, sane, and secure conditions of confinement and habitable living space for the residents and workplace for their coworkers, at the Osborn Correctional Institution and the acts, errors, and omissions of his fellow officers when he wantonly, recklessly, or maliciously and at all times willfully engaged in or otherwise performed certain acts, errors, or omissions that are the direct, proximate and sole cause of the conditions or events that subjected or otherwise caused the plaintiff to be subjected to the deprivation of the free exercise or enjoyment of any of his . . . inherent rights . . . such as, among others, those guaranteed, protected, and secured to him as particularly enumerated by Articles I, IV, V, VI, VIII, X, and XIV of the Amendments to the Constitution for the United States and the acts, errors, or omissions were committed under such circumstances, that they could not and would not have occurred but for the fact that the defendant was an official then and there exercising his official powers as a Corrections Officer of the Connecticut Department of Corrections clothed with the authority of the State of Connecticut.


   15. Defendant Mr. Ware or Corrections Officer Ware.
   At all times relevant hereto, Defendant Mr. Ware or Corrections Officer Ware, was acting under color of law, office, or badge of authority with the semblance, presumption, or pretense of authority sustaining the acts of a public officer which are solely derived from his apparent title to his respective office --- i.e. a Corrections Officer of the Connecticut Department of Corrections --- a supervisory position wherein he was immediately and proximately responsible for promoting and providing for the safe, sane, and sanitary conditions of confinement and workplace environment including the physical structure, its equipment, and vital systems as is reasonably necessary and required to ensure healthy, safe, sane, and secure conditions of confinement and habitable living space for the residents and workplace for their coworkers, at the Osborn Correctional Institution and the acts, errors, and omissions of his fellow officers when he wantonly, recklessly, or maliciously and at all times willfully engaged in or otherwise performed certain acts, errors, or omissions that are the direct, proximate and sole cause of the conditions or events that subjected or otherwise caused the plaintiff to be subjected to the deprivation of the free exercise or enjoyment of any of his . . . inherent rights . . . such as, among others, those guaranteed, protected, and secured to him as particularly enumerated by Articles I, IV, V, VI, VIII, X, and XIV of the Amendments to the Constitution for the United States and the acts, errors, or omissions were committed under such circumstances, that they could not and would not have occurred but for the fact that the defendant was an official then and there exercising his official powers as a Corrections Officer of the Connecticut Department of Corrections clothed with the authority of the State of Connecticut.


16. Defendant Mr. Conteras or Corrections Officer Conteras.
   At all times relevant hereto, Defendant Mr. Conteras or Corrections Officer Conteras, was acting under color of law, office, or badge of authority with the semblance, presumption, or pretense of authority sustaining the acts of a public officer which are solely derived from his apparent title to his respective office --- i.e. a Corrections Officer of the Connecticut Department of Corrections --- a supervisory position wherein he was immediately and proximately

responsible for promoting and providing for the safe, sane, and sanitary conditions of confinement and workplace environment including the physical structure, its equipment, and vital systems as is reasonably necessary and required to ensure healthy, safe, sane, and secure conditions of confinement and habitable living space for the residents and workplace for their coworkers, at the Osborn Correctional Institution and the acts, errors, and omissions of his fellow officers when he wantonly, recklessly, or maliciously and at all times willfully engaged in or otherwise performed certain acts, errors, or omissions that are the direct, proximate and sole cause of the conditions or events that subjected or otherwise caused the plaintiff to be subjected to the deprivation of the free exercise or enjoyment of any of his . . . inherent rights . . . such as, among others, those guaranteed, protected, and secured to him as particularly enumerated by Articles I, IV, V, VI, VIII, X, and XIV of the Amendments to the Constitution for the United States and the acts, errors, or omissions were committed under such circumstances, that they could not and would not have occurred but for the fact that the defendant was an official then and there exercising his official powers as a Corrections Officer of the Connecticut Department of Corrections clothed with the authority of the State of Connecticut.

17. Defendant Mr. Ocasio or Corrections Officer Ocasio.
  At all times relevant hereto, Defendant Mr. Ocasio or Corrections Officer Ocasio, was acting under color of law, office, or badge of authority with the semblance, presumption, or pretense of authority sustaining the acts of a public officer which are solely derived from his apparent title to his respective office --- i.e. a Corrections Officer of the Connecticut Department of Corrections --- a supervisory position wherein he was immediately and proximately responsible for promoting and providing for the safe, sane, and sanitary conditions of confinement and workplace environment including the physical structure, its equipment, and vital systems as is reasonably necessary and required to ensure healthy, safe, sane, and secure conditions of confinement and habitable living space for the residents and workplace for their coworkers, at the Osborn Correctional Institution and the acts, errors, and omissions of his fellow officers when he wantonly, recklessly, or maliciously and at all times willfully engaged in or otherwise performed certain acts, errors, or omissions that are the direct, proximate and sole cause of the conditions or events that subjected or otherwise caused the plaintiff to be subjected to the deprivation of the free exercise or enjoyment of any of his . . . inherent rights . . . such as, among others, those guaranteed, protected, and secured to him as particularly enumerated by Articles I, IV, V, VI, VIII, X, and XIV of the Amendments to the Constitution for the United States and the acts, errors, or omissions were committed under such circumstances, that they could not and would not have occurred but for the fact that the defendant was an official then and there exercising his official powers as a Corrections Officer of the Connecticut Department of Corrections clothed with the authority of the State of Connecticut.

18. Defendant Mr. Floodquist or Corrections Officer Floodquist.
  At all times relevant hereto, Defendant Mr. Floodquist or Corrections Officer Floodquist, was acting under color of law, office, or badge of authority with the semblance, presumption, or pretense of authority sustaining the acts of a public officer which are solely derived from his apparent title to his respective office --- i.e. a Corrections Officer of the Connecticut Department of Corrections --- a supervisory position wherein he was immediately and proximately responsible for promoting and providing for the safe, sane, and sanitary conditions of confinement and workplace environment including the physical structure, its equipment, and vital systems as is reasonably necessary and required to ensure healthy, safe, sane, and secure conditions of confinement and habitable living space for the residents and workplace for their coworkers, at the Osborn Correctional Institution and the acts, errors, and omissions of his fellow officers when he wantonly, recklessly, or maliciously and at all times willfully engaged in or otherwise performed certain acts, errors, or omissions that are the direct, proximate and sole cause of the conditions or events that subjected or otherwise caused the plaintiff to be subjected to the deprivation of the free exercise or enjoyment of any of his . . . inherent rights . . . such as, among others, those guaranteed, protected, and secured to him as particularly enumerated by Articles I, IV, V, VI, VIII, X, and XIV of the Amendments to the Constitution for the United States and the acts, errors, or omissions were committed under such circumstances, that they could not and would not have occurred but for the fact that the defendant was an official then and there exercising his official powers as a Corrections Officer of the Connecticut Department of Corrections clothed with the authority of the State of Connecticut.

  19. Defendant John Doe 1 or Corrections Officer Doe 1.
  At all times relevant hereto, Defendant John Doe 1 or Corrections Officer Doe 1, was acting under color of law, office, or badge of authority with the semblance, presumption, or pretense of authority sustaining the acts of a public

officer which are solely derived from his apparent title to his respective office --- i.e. a Corrections Officer of the Connecticut Department of Corrections --- a supervisory position wherein he was immediately and proximately responsible for promoting and providing for the safe, sane, and sanitary conditions of confinement and workplace environment including the physical structure, its equipment, and vital systems as is reasonably necessary and required to ensure healthy, safe, sane, and secure conditions of confinement and habitable living space for the residents and workplace for their coworkers, at the Osborn Correctional Institution and the acts, errors, and omissions of his fellow officers when he wantonly, recklessly, or maliciously and at all times willfully engaged in or otherwise performed certain acts, errors, or omissions that are the direct, proximate and sole cause of the conditions or events that subjected or otherwise caused the plaintiff to be subjected to the

deprivation of the free exercise or enjoyment of any of his . . . inherent rights . . . such as, among others, those guaranteed, protected, and secured to him as particularly enumerated by Articles I, IV, V, VI, VIII, X, and XIV of the Amendments to the Constitution for the United States and the acts, errors, or omissions were committed under such circumstances, that they could not and would not have occurred but for the fact that the defendant was an official then and there exercising his official powers as a Corrections Officer of the Connecticut Department of Corrections clothed with the authority of the State of Connecticut.

20. Defendant John Doe 2 or Corrections Officer Doe 2.
   At all times relevant hereto, Defendant John Doe 2 and Corrections Officer Doe 2, was acting under color of law, office, or badge of authority with the semblance, presumption, or pretense of authority sustaining the acts of a public officer which are solely derived from his apparent title to his respective office --- i.e. a Corrections Officer of the Connecticut Department of Corrections --- a supervisory position wherein he was immediately and proximately responsible for promoting and providing for the safe, sane, and sanitary conditions of confinement and workplace environment including the physical structure, its equipment, and vital systems as is reasonably necessary and required to ensure healthy, safe, sane, and secure conditions of confinement and habitable living space for the residents and workplace for their coworkers, at the Osborn Correctional Institution and the acts, errors, and omissions of his fellow officers when he wantonly, recklessly, or maliciously and at all times willfully engaged in or otherwise performed certain acts, errors, or omissions that are the direct, proximate and sole cause of the conditions or events that subjected or otherwise caused the plaintiff to be subjected to the deprivation of the free exercise or enjoyment of any of his . . . inherent rights . . . such as, among others, those guaranteed, protected, and secured to him as particularly enumerated by Articles I, IV, V, VI, VIII, X, and XIV of the Amendments to the Constitution for the United States and the acts, errors, or omissions were committed under such circumstances, that they could not and would not have occurred but for the fact that the defendant was an official then and there exercising his official powers as a Corrections Officer of the Connecticut Department of Corrections clothed with the authority of the State of Connecticut.

21. Defendant Tiffany J. Dyke or DOC Nurse Dyke RN.
   At all times relevant hereto, Defendant Tiffany J. Dyke or DOC Nurse Dyke RN was acting under color of law, office, or badge of authority with the semblance, presumption, or pretense of authority sustaining the acts of a public officer which are solely derived from her apparent title to her respective office --- i.e. a Registered Nurse of the Connecticut Department of Corrections --- a supervisory position wherein she was immediately and proximately responsible for promoting and providing for the safe, sane, and sanitary conditions of confinement and workplace environment including the physical structure, its equipment, and vital systems as is reasonably necessary and required to ensure healthy, safe, sane, and secure conditions of confinement and habitable living space for the residents and workplace for their coworkers, at the Osborn Correctional Institution and the acts, errors, and omissions of her fellow workers when she wantonly, recklessly, or maliciously and at all times willfully engaged in or otherwise performed certain acts, errors, or omissions that are the direct, proximate and sole cause of the conditions or events that subjected or otherwise caused the plaintiff to be subjected to the deprivation of the free exercise or enjoyment of any of his . . . inherent rights . . . such as, among others, those guaranteed, protected, and secured to him as particularly enumerated by Articles I, IV, V, VI, VIII, X, and XIV of the Amendments to the Constitution for the United States and the acts, errors, or omissions were committed under such circumstances, that they could not and would not have occurred but for the fact that the defendant was an official then and there exercising her official powers as a Registered Nurse of the Connecticut Department of Corrections clothed with the authority of the State of Connecticut.

22. Defendant Melissa S. Winiarz or DOC Social Worker Winiarz.
   At all times relevant hereto, Defendant Melissa S. Winiarz or DOC Social Worker Winiarz was acting under color

of law, office, or badge of authority with the semblance, presumption, or pretense of authority sustaining the acts of a public officer which are solely derived from her apparent title to her respective office --- i.e. a Social Worker of the Connecticut Department of Corrections --- a supervisory position wherein she was immediately and proximately responsible for promoting and providing for the safe, sane, and sanitary conditions of confinement and workplace environment including the physical structure, its equipment, and vital systems as is reasonably necessary and required to ensure healthy, safe, sane, and secure conditions of confinement and habitable living space for the residents and workplace for their coworkers, at the Osborn Correctional Institution and the acts, errors, and omissions of her fellow workers when she wantonly, recklessly, or maliciously and at all times willfully engaged in or otherwise performed certain acts, errors, or omissions that are the direct, proximate and sole cause of the conditions or events that subjected or otherwise caused the plaintiff to be subjected to the deprivation of the free exercise or enjoyment of any of his . . . inherent rights . . . such as, among others, those guaranteed, protected, and secured to him as particularly enumerated by Articles I, IV, V, VI, VIII, X, and XIV of the Amendments to the Constitution for the United States and the acts, errors, or omissions were committed under such circumstances, that they could not and would not have occurred but for the fact that the defendant was an official then and then exercising her official powers as a Social Worker of the Connecticut Department of Corrections clothed with the authority of the State of Connecticut.

23. Defendant Heather M. Gaw or DOC Psychologist Dr. Gaw.
   At all times relevant hereto, Defendant Heather M. Gaw or DOC Psychologist Dr. Gaw, was acting under color of law, office, or badge of authority with the semblance, presumption, or pretense of authority sustaining the acts of a public officer which are solely derived from her apparent title to her respective office --- i.e. a Psychologist of the Connecticut Department of Corrections --- a supervisory position wherein she was immediately and proximately responsible for promoting and providing for the safe, sane, and sanitary conditions of confinement and workplace environment including the physical structure, its equipment, and vital systems as is reasonably necessary and required to ensure healthy, safe, sane, and secure conditions of confinement and habitable living space for the residents and workplace for their coworkers, at the Osborn Correctional Institution and the acts, errors, and omissions of her fellow workers when she wantonly, recklessly, or maliciously and at all times willfully engaged in or otherwise performed certain acts, errors, or omissions that are the direct, proximate and sole cause of the conditions or events that subjected or otherwise caused the plaintiff to be subjected to the deprivation of the free exercise or enjoyment of any of his . . . inherent rights . . . such as, among others, those guaranteed, protected, and secured to him as particularly enumerated by Articles I, IV, V, VI, VIII, X, and XIV of the Amendments to the Constitution for the United States and the acts, errors, or omissions were committed under such circumstances, that they could not and would not have occurred but for the fact that the defendant was an official then and then exercising her official powers as a Psychologist of the Connecticut Department of Corrections clothed with the authority of the State of Connecticut.

## JURISDICTION

This action was commenced pursuant to, among other things, Articles I and XIV of the Amendments to the Constitution for the United States and 42 USC ss 1983 and 1988.

   The plaintiff is a Citizen of Connecticut, not a Citizen of another State and therefore, unequivocally, has lawful standing.

   There is nothing in the essence, spirit, or letter of Article XI of the Amendments to the COTUS that bars this plaintiff from petitioning this court or seeking judicial restitution in the form of monetary damages from the State of Connecticut or it agencies . . .departments . . . offices, etc. or its agents. . . employees . . . officers, etc. in their official capacities as remedy or relief for actual injuries (deprivation of rights) inflicted upon him by governmental actions and inactions.

   Neither the United States nor the Connecticut Constitutions ordain or establish an unaccountable sovereign State, nor do they grant the Executive, Legislative, or Judicial offices the power to declare themselves or each other sovereign or immune either.

See the Memorandum of Rights

## AFFIDAVIT OF FACTS

Except for matters asserted on information or belief, and, as to those I believe them to be accurate, actual, and true, I, Jose Garcia-- upon penalty of perjury -- hereby solemnly and sincerely affirm that the facts I shall give concerning this matter, herein this Affidavit of Facts, are the truth, the whole truth, and nothing but the truth.

These are material facts set forth in a manner whereby an honest, impartial, and reasonable person who possesses ordinary good sense, intelligence, and judgment would, without hesitancy, understand and believe to be accurate, actual, and true to an absolute or reasonable degree of moral and legal certainty abundantly sufficient to demonstrate the meritoriousness and validity of this petitioner's claim and that the totality of the facts, circumstances, and laws surrounding this matter are of great legal significance and important to the People of Connecticut and will substantially aid or contribute to their understanding of the ongoing operations of government.

1. As an ordinary course of business in the ongoing operations of the administration of government, the State of

Connecticut, its agencies, associations, bureaucracies, contractors, departments, municipalities, offices,

organizations, etc. have joined in partnership in official lawlessness and have long been engaged in ongoing patterns

of unlawful government misconduct, committing or otherwise performing acts, errors, and omissions that frustrate

the fair and proper administration of justice and law, critically impairs the legitimate function of government, and

are characteristic of and consistent with those of a racketeer influenced and corrupt organization.

While acting with the semblance, presumption, or pretense of authority sustaining the acts of a public officer which

are solely derived from their apparent titles to their respective offices, the Executive, Legislative, and Judicial

offices of Connecticut have a long history and proficiency in the misconstruction and abuse of the legitimate powers

of government and have presumptuously subverted such offices to advance, promote, protect, or secure the personal,

professional, political, or economic status, prestige of office, or other advantage, benefit, interest, privilege to

themselves, their agents, associates, bureaucrats, contractors, employees, elected officials, family, friends, officers,

organizers, parties, volunteers, etc. and, well without and beyond the lawful bounds of their legitimate authority and

the powers consented to by the governed -- i.e. the People of Connecticut -- and thereby granted to them by the

Constitutions, they have wantonly, recklessly, or maliciously and at all times willfully abolished, abridged, or

abrogated the . . . inherent rights . . . of the People of Connecticut by adhering to, enacting, or otherwise enforcing

irregular, unauthorized, unconstitutional, and underhanded acts, beliefs, codes, "common law," contracts,

derelictions, "doctrines," policies, precedence, rules, statutes, "systems", and other such improper,  presumptuous,

and subversive practices and procedures that are glaringly repugnant to the fundamental principles inherent in our

Constitutions having or being of the fundamental nature or quality of purpose or design most inevitability-certain and intended:

  (a). to subject the People of Connecticut to the deprivation of the free exercise or enjoyment of any of their inalienable, indefeasible, and inherent rights, privileges, or immunities guaranteed, protected, or secured to them by the Constitution for the United States or of the State of Connecticut

  (b). to defraud the United States Government out of "every federal dollar potentially available" to the State . . . its agencies . . . departments . . . offices . . . etc. by any means, methods, or misappropriations whatsoever and

  (c). to coverup, conceal, justify, or normalize any such presumptuous subversions and any malfeasance, misconduct, or mistakes committed by themselves, their agents . . . officers  . . . etc. under such color of law, office, or badge of authority through the use of intimidation, undue physical force or the threat thereof, the pettifoggery of wild unicorn chases being forced to pursue and exhaust imaginary, nonexistent remedies or relief in inferior, often private tribunals conducted out of the sight or knowledge of the People of Connecticut, and administered by the very same persons who, indeed, have deprived us of our . . . inherent rights . . . in the first place, fabricated public records, and inherently-futile "check-box-sham proceedings" in the state courts wherein we are denied the equal protection or due process of law and any chance for an accurate, appropriate, and equitable outcome is, inevitably, altogether impossible.

  2.  The State of Connecticut -- i.e. the Executive, Legislative, and Judicial Offices -- have long taken a " hands off" approach and attitude concerning the DOC and their policies, practices, and procedures involving the care, concern, and treatment of the inmates and the care, conditions, and maintenance of the facilities, effectively putting them off limits to any meaningful oversight by fire marshals, building inspectors, health inspectors or any otherwise independent, impartial, and qualified persons who are able to perform routine and random inspections with complete, unobstructed access to the facilities as is reasonably necessary and required to properly maintain the safety of physical structures and their environments and ensure a healthy, safe, living space for the residents and workplace for the staff, as is mandatory for every other public or private facility, wherefore most of their facilities

are in and have long been in an advanced, accelerated, or perpetual state of decay, dereliction, disrepair, or

uninhabitability which subjects all of the inmates to extraordinarily-unusual hazardous, inhumane, and unhygienic

conditions of confinement conducive to injury, grief or pain that deprives them the free exercise and enjoyment of,

among other things, their . . . inherent rights . . . to be free from cruel and unusual punishment.


No state legislator or executive or judicial officer can act or war against the Constitutions without violating their

oath  and undertaking to defend and uphold them.


  These willful derelictions of duty, systemic failures, partnerships in official lawlessness, and unlawful government

misconduct that have long been the ordinary course of business in the ongoing operations of the Executive,

Legislative, and Judicial offices of the State of Connecticut have frustrated the fair and proper administration of

justice and law, critically impaired the legitimate function of government and are the direct, proximate, and sole

cause of the acts, errors, or omissions performed or committed under color of law, office, or badge of authority that

subjected or caused this plaintiff/petitioner to be subjected to the deprivation of the free exercise or enjoyment of

any of his inalienable, indefeasible, and inherent rights, privileges, and immunities guaranteed, protected, or secured

to him by the Constitution for the United States or of the State of Connecticut such as, among others, to be free from

such cruel and unusual punishments inflicted upon him by way of such conditions of confinement that are well

below ordinary and reasonable standards of decency or habitability and cause or are conducive to injury, grief, or

pain.


  3. The DEPARTMENT OF CORRECTIONS (DOC), as an ongoing entity that exercises and enjoys benefits and

privileges of a legal "person" in and of itself, irrespective of any particular human or otherwise natural appearing

person assuming the title, occupying the office of, or otherwise acting as Commissioner, Warden, Deputy Warden,

Captain, Unit Head, Officer, etc., has a long history of being, and has long been indifferent or otherwise derelict in

their constitutionally imposed duties to prevent undue injury, grief, or pain and other cruel or unusual punishment of

those entrusted to their care, custody, and guardianship and to promote and provide a safe and sanitary working and

living environment for the residents and staff, by refusing, neglecting, or otherwise failing to appropriately vet,

select, and adequately and effectively train their agents . . . employees . . . officers etc. in safe and effective

techniques of anger-management, de-escalation, reasonable-prudence, and self-control and facilities/building management and how to properly administer, implement, or otherwise enforce the proactive and reactive measures of care, upkeep, preventive maintenance, or emergency repair of their facilities as they have established -- or have otherwise neglected to establish -- in their own "Administrative Directives" and as are reasonably necessary and required to assure the efficient, proper, and safe operation of their facilities and prevent readily-avoidable and undue injury, grief, or pain to the inmates or staff or accident, damage, corrosion, deterioration, contamination, failure, or shutdown of an area, appliance/equipment, or vital systems that are essential to support life, health, hygiene, fire safety, etc. (e.g. potable water, electric, sewage, heating, ventilation, and cooling, etc.) and the safe handling (i.e. properly identifying, abating, applying, containing, quarantining, decontaminating, removing, selecting, storing, testing, or use) of biological or chemical agents, elements, emissions, or growths or any combination of such materials or substances thereof that are caustic, carcinogenic, combustible, neurodegenerative, neuroendocrinological, noxious, poisonous, toxic, etc. by nature, mixture, or manipulation in any form of liquid, solid, or gas, whether immediately or obviously perceived by the senses as that which you can readily see, smell, taste, touch, etc. or otherwise imperceptible requiring deliberate testing, and cause or create conditions of confinement that are hazardous, inhumane, or uninhabitable and unduly subject the inmates, officers and other People of Connecticut -- i.e. the public -- to a substantial risk of injury, grief, pain, or death and undue jeopardy to their health, hygiene, longevity or quality of life, safety, and security by way of exposure through the transdermal contact (through the skin), digestion, or inhalation of such hazardous materials or substances.

DOC's "Administrative Directives" requires that "Each unit head or designee shall be reasonable to ensure that ALL STAFF ARE OBSERVING THE CONDITIONS of their assigned area." and that "Each (i.e. every individual one, being one of the officers and staff of DOC) SHALL BE MANDATED to report any unsafe conditions or items of the building that needs maintenance or repair.

 As an ordinary course of business in the ongoing operations of the Connecticut DOC, there has long been intimated, promoted, and maintained in perpetuity by a majority of the officers throughout its facilities an "Us and Them" atmosphere, attitude, or air of animosity, indifference, or disdain towards the inmates as a caste of mindless, senseless, and subhuman beings unworthy of even the slightest iota of civility, dignity, honesty, or humanity --- mere

fodder for their merriment, mischief, or foolery --- wherefore they have wantonly, recklessly, or maliciously and at all times willfully refused, neglected, or otherwise failed to establish, enact, or enforce any such meaningful Administrative Directives evincing of any such careful study, attention, systematic analysis or inquiry into the readily- or reasonably-well-known circumstances, conditions, and situations as have long existed as essential elements in Connecticut's and America's prisons or are intrinsic parts of human nature as has been assumed by the Executive, Legislative, and Judicial offices and as is reasonably necessary and required to establish, enact, and enforce such Administrative Directives having or being of the fundamental nature or quality of purpose and design capable of establishing a reasonable probability to effectively achieve, promote, and maintain conditions of confinement conducive to actual, obvious, and otherwise clearly defined and identifiable penological interests and objectives whereby the rights of all parties involved are protected and enforced and their obligations or responsibilities toward each other are clearly defined to create a workplace atmosphere and living environment within the lawful bounds of the Constitutions so as to ensure appropriate levels of safety, sanity, habitability, and security within the prison system and to minimize the potential risk for injury, grief, or pain for both prisoners and staff, instead of the current, endless charade of the mindlessly-ambiguous and tediously-vague nitpicking and nattering over such incidental, inherently-inconsequential, petty, trite, and mind-numbingly-trivial issues that serve no justifiable penological purpose within the system or for the greater community outside, promotes a make-it-up-and-guess-as-you-go, cause-you-can-lie-about-it-later atmosphere and environment wherein excessive or undue force and violence, inevitably, is the first and final solution to every challenge or situation that may arise for the umpteenth time and the air is thick with fear and loathing from both "sides".

   Whereas there exists a well-known "Brotherhood" among members of law enforcement, an "all for one and one for all" type mentality exists whereby it is not uncommon for otherwise unaffected officers to take personal offense to someone seeking relief for the act, errors, or omissions of another, even unknown officer and embark on a scheme of retaliation or revenge against them on behalf of the "Brotherhood." Corrections Officer are moved about the system as are the inmates, therefore moving the petitioner to another facility does not render this petitioners  prayer for declaratory or injunctive relief moot because it does not eliminate the likelihood or otherwise prevent further injury, grief or pain.

Furthermore, declaratory and injunctive relief are the only reasonably viable remedies available to compel the State and DOC to establish, enact, and enforce constitutionally adherent Administrative Directives.

4.  By creating, condoning, or continuing to ignore, or promote an atmosphere and attitude of apathy or indifference toward the inmates' . . . inherent rights . . . to safe, sanitary, and secure conditions of confinement and a reasonable expectation of habitability free from cruel and unusual punishments, continually inflicted upon them by way of the ongoing  mismanagement and neglect of their facilities, the Osborn Correctional Facility has long been in a state of decay, deterioration, and disrepair and at all times relevant was and is, by all legal standards and definitions -- uninhabitable and condemnable.

(a) There was no potable water. The water had long been contaminated with excessively high, unhealthy, and harmful levels of arsenic and was not safe for human consumption or contact (i.e. drinking or bathing.)

(b) DOC had/has no Administrative Directives and had not provided any instruction or training for their agents . . . officers etc. on precisely how to manage emergency situation of this magnitude.

(c) In April 2021, DOC posted a notice warning the inmates of the contamination, but refused, neglected, or otherwise failed to provide an alternate source of water for the inmates to drink or bath with as is reasonably necessary and required to maintain proper health, hygiene, and the most minimal and basic standard of quality of life and is vitally important to sustain life

(d) DOC did provide staff with bottled water to drink.

6.  Readily well-known to the DOC, the petitioner suffers with a number of physical and other affections, limitations, and disabilities and had been diagnosed with asthma and bipolar. He had previously been treated by DOC for acute and chronic physical and other ordinarily anxiety-inducing disabilities that are relatively common among inmates and prisoners that, to ensure the safety, security, and order of all involved, require prompt and proper acknowledgement, identification, and reasonable accommodations by the officers, staff, and especially the "mental health professionals" in their ordinary course of business and ongoing operations of the observation, analysis, interaction with, or, if necessary, the de-escalation of inmates whose behaviors are those of a person experiencing episodes of anxiety or grief that might not be readily-obvious or otherwise known to a layperson but should be

evident to a properly vetted and appropriately trained corrections officer, but that are disregarded as inconsequential and irrelevant or altogether ignored which often escalates a situation and accelerates the likelihood of inflicting undue injury, grief, or pain upon the inmate, officers, and other staff. DOC's continuing failure to properly acknowledge that such training is reasonably necessary and required for their . . . officers, etc. most often results in the escalation of such situations.

7. At all times relevant hereto, the petitioner was housed at the Osborn Correctional Institution in Osborn, CT in Housing Unit E, Cell-1. The years of ongoing and willful apathy and neglect toward the management and maintenance of the physical structure by the DOC had resulted in conditions of confinement that caused the plaintiff to be inflicted with serious physical injury, mental anguish (grief), and pain which, in and of itself is cruel and unusual punishment.

8. These substantial and systemic failures are the ordinary course of business in the ongoing operations of the DOC that resulted in the unlawful conditions of confinement and, indeed, are the direct, proximate, or sole cause and the first in a series of a progression of events that singularly and in combination with each other constitutes as the wanton, reckless, or malicious and at all times willful subjecting of the plaintiff to the deprivation of the free exercise or enjoyment of any of his . . . inherent rights . . . .

9. Knowing that he had long been ingesting and was otherwise exposed to the transdermal absorption or inhalation of exceedingly high levels of a noxious, toxic, or otherwise poisonous substance ---i.e. arsenic --- from Osborn's contaminated water system, and that the DOC had willfully refused, neglected, or otherwise failed inform the inmates and this plaintiff of the contamination until after it was "fixed" and had refused . . . to provide an alternative source of potable water to the inmates while the water was contaminated, this petitioner was subjected to the substantial risk of serious physical injury which caused him to unduly suffer accelerated, excessive levels of anxiety and emotional distress.

10. On numerous and diverse dates since the discovery of the contaminated water system, the plaintiff discussed with other inmates and with his mother, via the Securus, inmate telephone system which is recorded and monitored

by the DOC, the possibilities of bringing a suit against the DOC for the exposure to undue risk of serious physical injury, grief, and pain and their deliberate indifference in refusing . . . to provide even the most basic remedies while they knew of the risk of serious physical injury to the plaintiff.

11. Because of the longstanding and ongoing neglect of the physical facility, and the lack of proper preventive maintenance, in May of 2021, water contaminated with, among other things, black mold spores, a noxious substance, began leaking into the plaintiff's assigned cell from the electrical fixtures through a crack in the tiles and floor in the showers above his cell.

12. Over the next three (3) months the plaintiff brought the issue of the leaky shower and unhygienic, inhumane, and unsafe conditions of confinement to the attention of numerous members of DOC staff, including, among others, Captain Perez. All of whom are "mandated to report any unsafe conditions or items of the building that need maintenance or repair".  Plaintiff reasonably believed that such reports were submitted to the appropriate parties.

13. Despite numerous written requests, maintenance and the administration refused, neglected, or otherwise failed to promptly and properly assess and acknowledge the severity of the situation concerning the hazardous, inhumane, unhygienic, and uninhabitable conditions of the plaintiff's cell and effectively prioritize the emergency repairs as reasonably necessary and required according to DOC's Administrative Directives or move the plaintiff to a cell that didn't leak or contain suspected contaminates etc. as ordinary good sense, intelligence, and judgment demand.

14. During this time of apathy and inaction, and at all times relevant hereto, the plaintiff suffered with anguish and numerous asthma and anxiety attacks that were brought on and exacerbated by the black mold spores, moisture, and overall-unsanitary conditions of confinement in his assigned cell, and thereby inflicted with cruel and unusual punishment.

15. An inmate cannot insist on being moved or refuse to live in an unsafe, or unsanitary cell because they will be unduly punished with a Class A Disciplinary Report, and will be sent to the Restrictive Housing Unit/" Segregation" and lose their job and property etc. in the "process."

16. On August 18, 2021, the plaintiff filed a Level 1 Inmate Grievance Form.

17. Eventually, on a date unknown, the plaintiff was momentarily removed from his cell and made to stand in a shower within the housing unit so that tests could be taken to determine what types of noxious substances were in the water that was coming through the cracks and electrical fixtures into the plaintiff's assigned cell

18. In E- unit#1 cell black mold, a noxious substance that can become airborne, a clear and present danger that posed a substantial risk of serious physical injury to the plaintiff, other inmates, and staff.

19. One day, during the last week of August 2021, DOC moved the plaintiff and all of the other inmates to Housing Unit B so that repairs could be made.

20. This was a substantial undertaking that created extra work for the officers and staff and was a major inconvenience for them that produced an air of resentment toward the plaintiff.

21. The next day, the plaintiff was returned to Housing Unit E to clean the contaminated unit of demolition and other hazardous debris.

22. The black mold did not appear to have been properly abated and contained according to the State of Connecticut's building and health codes and other such minimum safety standards as required for the safe handling and disposal of such noxious substances and was still present and visible throughout the showers.

23. DOC wantonly, recklessly, or maliciously and at all times willfully refused, neglected, or otherwise failed to provide the plaintiff or other tier workers with even the most minimal amount of safety equipment and protective gear as is required by law for the abatement, cleaning, removal, disposal, etc. of such hazardous and noxious materials and substances according to the Occupational Safety and Health Administration's (OSHA) standards, the State of Connecticut's building and health codes and other such standards as required by the DOC's Administrative

Directives. A systemic failure due to the gross inadequacies of the DOC's Administrative Directives' ambiguous, vague, and otherwise equivocally written policies, practices, or procedures.

24. At or about 7:45am, on September 13, 2021, Corrections Officer (CO) Ruthowski, accompanied by another, unknown corrections officer, informed the plaintiff and the other Housing-Unit-E "tier workers" --- i.e., janitors --- that they would be returning to E Unit ahead of the rest of the population for the purpose of cleaning and decontaminating the unit.

25. The plaintiff and the other tier workers returned to E Unit for the sole purpose of cleaning and decontaminating the unit.

26. While the plaintiff was cleaning and decontaminating E Unit, CO Ruthowski told the plaintiff to direct the attention of the maintenance officers to the leak and black mold in his cell --- cell-1. They inspected the cell and observed the water leaking into his cell through the electrical fixtures, the mold, and the water throughout.

27. At some point while the plaintiff was working in Unit E, CO Ruthowski, accompanied by an unknown corrections officer, asked the plaintiff for the combination to the lock on his locker in his cell in Unit B. He complied and gave them the combination. They relayed the information back to Housing Unit B. They really didn't need the combination because they have a master key.

28. The plaintiff and the other tier workers finished their work at or about 10:15am and were returned to Housing Unit B.

29. The plaintiff made a cup of coffee in his cell and then went to the "day room" or common area for "recreation."

30. At or about 10:45am Defendant Lieutenant Clayton entered the unit (B) and had a brief discussion with Defendant CO Stygall who was assigned to a post in the unit at that time. Stygall pointed at and identified the plaintiff to him.

31. Defendant Stygall had been the subject of an embarrassing comment made about him in front of his peers by the plaintiff. The comment had taken on a life of its own among the other officers and Defendant Stygall fostered a vendetta against the plaintiff.

32. Defendant Clayton approached the plaintiff and without any explanation or indication why --- fair notice of the charges --- ordered him to put his hands on the wall to be placed in handcuffs. The plaintiff complied. After being cuffed the plaintiff asked Defendant Clayton "What's going on?"

33. Defendant Clayton informed the petitioner he was being escorted to the Restrictive Housing Unit (RHU) --- i.e., "segregation" ---because Defendant Stygall had alleged to have found contraband (unprescribed medications/controlled substances) in the plaintiff's cell earlier that morning while the plaintiff was working in Unit E.

34. It did not appear to the plaintiff that Defendant Clayton was following proper procedures as required by the Administrative Directives.

35. The plaintiff had been Disciplinary Report free for about three (3) years and had personally endeavored to improve himself, his circumstances, and consequences for his children, family, and himself. He had not been involved in any type of drug activities, knew the contraband was not his, and believed with an absolute or reasonable degree of moral and legal certainty that was being retaliated against for exercising his rights or otherwise trying to.

36. Once "processed" into the RHU, the plaintiff again inquired as to what the contraband was that was alleged to have been found in his cell. Defendant Clayton sneered at the plaintiff and, with a cunning grin, said "A cup with six (6) pills that weren't prescribed to you"

37. All attempts by the plaintiff to deny that any such cup of pills could have been found in his cell or have belonged to him were ignored and met with jeers from Defendant Clayton who derided that the plaintiff should

"Take it up with the Disciplinary Hearing Investigator since you like to complain so much" referring to, among other things, the plaintiff's repeated requests to have his cell repaired.

38.  The DOC had/has no policies, practices, or procedures in place to protect against the spoliation, tampering with, or fabrication of physical evidence.

39.  The DOC's Administrative Directives, policies, practices, and procedures are purposely designed and intended to be antagonistic, one-sided, and subject inmates to undue animosity, humiliation, and the deprivation of the free exercise or enjoyment of any of their . . . inherent rights . . . . If an accusation is made against you by the staff or even another inmate, first and foremost, you are punished. You are "perp walked" to RHU where you are filmed as you are stripped naked before a group of men and are ordered to squat, cough, bend over, spread your cheeks, smile wide, and wink for the camera. Your property is treated like trash, literally, it is thrown into clear trash bags wherein it is thoroughly mixed up, mangled, and mutilated, crammed into a cart and wheeled off to A/P to be "processed", which most often means they take it, toss it, or it's otherwise stolen by the inmate A/P workers as a "perquisite" and then they might pretend to do an investigation or "inquiry" that, inevitably, all comes down to "you're guilty because we said you are." If you deny any accusations, you are openly laughed at, derided and ridiculed. "Everyone says they're innocent, ha ha, ha ha" Even when they know you are, indeed, innocent because they are the ones who are falsely accusing you or are one of the people planting, tampering with, or fabricating the so-called "evidence" being used against you --- i.e., "setting you up".

40.  Being falsely accused, especially when there are immediate, impending, and inevitable consequences, by human nature, is inherently and ordinarily frustrating and intensely distressing for everyone whether president, peon, or Pope. However, when you are subjected to an inherently-inequitable, after-the-fact process for remedy or relief that is conducted and controlled by your accusers --- an indubitable exercise in futility wherein any chance of an honest, equitable outcome is altogether imaginary and nonexistent --- it is downright maddening. Add the essential elements of the degradingly-gratuitous humiliation of the Not-So-Magic-Mike strip Ts (terror, torment, torture, and trauma) and most every otherwise-ordinarily-reasonable person would be going off the rails on board the Crazy Train, fueled by such an overabundance of adrenaline that before you can say "All aboard!" everyone is doing the

Loco Motion, even the "mental health professionals" who should not only know better, but should, indeed, be able to exercise self-control, be in charge of their own faculties, and not take the inmates actions as a personal affront or offense or be caught up in the mutual animosity and excitement of the melee and conduct theirselves in a manner having or evincing of a reasonable probability of uncovering, identifying, and addressing the underlying issues and deescalating and diffusing the volatility of the situation and commanding control over the situation by communicating a genuineness of concern and appreciation for the validity of the inmate's perception of the situation and their emotional state with clarity and precision of expression instead of being antagonistic, condescending, and trite and chiding, deriding, or dismissing them as is the ordinary course of business in the ongoing operations of the "mental health professionals" within the DOC.

41.  It is rather indubitable that the DOC's Administrative Directives (ADs) --- i.e. policies, practices, and procedures --- create, condone, or otherwise facilitate or promote, among other things, animosity and the inflicting of serious physical injury, extreme emotional distress, and pain --- i.e. cruel and unusual punishment --- upon inmates and that such wantonly, recklessly, or maliciously and at all times willfully-arbitrary, ambiguous, or vaguely-written Administrative Directives have directly, proximately, or solely subjected or caused the plaintiff to be subjected to the deprivation of the free exercise or enjoyment of any of his . . . inherent rights . . . . They denied him a meaningful opportunity to speak and be heard at a critical point in the DOC's "criminal" process  deprived him of his right to be secure in his person, house, papers, effects, etc. against unreasonable search or seizure  subjected him to a "criminal prosecution" that deprived him of a "public" proceeding by an impartial "jury," to confront his accusers, to obtain witnesses on his behalf or to meaningful representation  deprived him of the already-pitiful-pittance of liberty and property he possessed without the equal protection or due process of law  and unduly inflicted upon the plaintiff, serious physical injuries, extreme anguish and other forms grief and pain.

42.  While it is reasonable to expect that the DOC should exercise jurisdiction over such matters it is equally as reasonable to expect that the policies, practices, and procedures are particularly described with clarity and precision of expression and intent having or being of the fundamental nature or quality of purpose and design intended to uphold and defend the inmates' . . . inherent rights . . . and ensure an equitable process and a just outcome.

43.  Neither Defendant Clayton nor any other defendant had  articulated any lawful justification or reason to believe

that the plaintiff presented a clear and present danger or any immediate, imminent, or inevitable threat or any

disruption to the peace and orderly operation of the facility or the discipline of the plaintiff or any other inmates by

reason of the plaintiff's actions or utterances or the actual occurrence, impending occurrence, or the planning of any

escape, physical injury or harm to any . . . officer, etc. other inmate, State's property or to himself by the plaintiff that

clearly warranted and thereby necessitated the plaintiff's detention in RHU or the use of physical force to get him

there.

44.  The defendants were not acting in the defense of themselves, another person, or peace or property, nor for the

safety and security of the facility or the plaintiff when they chose to use physical force on the plaintiff.

45.  The DOC's Administrative Directives are arbitrary, ambiguous, or vague and otherwise inconsistent with the

Connecticut General Statutes Sections 53a-17 et seq. that provide for the lawful use of reasonable physical force

wherefore the DOC is liable in and of itself as an ongoing entity as well as for the acts, errors, and omissions of its

agents . . . officers, etc. who were acting in their official capacities under color of such Administrative Directives,

policies, practices, or procedures etc. when they subjected or caused the plaintiff to be subjected to, among other

things, the deprivation of the free exercise or enjoyment of any of his . . . inherent rights . . . .

46.  The agents . . . officers, etc. of the State act under color of law, office, badge of authority, etc. when they are

acting within the bounds of their office, title, etc. in accordance with or enforcing an unconstitutional administrative

directive, policy, practice, procedure, statute, etc., however regular or valid it may appear on its face, and when they

are acting without and beyond the lawful bounds of their offices, titles, etc. while holding themselves out as agents .

. . officers, etc. of the State and can be sued in their official capacities in the former and individual capacities in the

latter.

47.  The plaintiff's cell had already been searched and any alleged contraband had already been removed, however,

no actual, honest, and impartial, investigation had yet to be performed. And, being that, in Connecticut, no person

shall be arrested, detained, or punished except in cases clearly warranted by law, the proper and constitutionally correct administrative procedure would have been to issue a "ticket," or a "Disciplinary Report" to begin a process reasonably able and likely to ascertain the accuracy, actuality, and truthfulness of the accusations and determine if an arrest, detention, or punishment is clearly warranted by law and, if so, who should be arrested or detained and what type and extent of punishment is warranted.

48.  State agencies . . . departments, etc. can't just subject its citizens to the deprivation of . . . their . . . inherent rights . . . as a matter of policy, practice, or procedure for their own convenience, expediency, or some other arbitrary reason.

49.  It is, however, reasonable to believe and somewhat rather readily-well-known to be expected that when a person is accused of an offense, especially falsely, and subjected to punishment --- especially that as humiliating as being "processed" into RHU --- without a meaningful opportunity to be heard or an inherently unfair process whereby they are consumed with hopelessness and overwhelmed by such trauma and torment, they will become anxious, despondent and frustrated and react in a way that will reasonably cause someone who might be able to help them to actually listen to them.

50.  Flooding the cell is probably the most-often-used or "default" method of prisoners since the invention of running water (i.e., plumbing). That this isn't a factor in the very design of the facilities themselves is a clear indication that the DOC should not have the independence it does as the sole arbiter, creator, and enforcer of its Administrative Directives.

51.  Naturally, such torment and trauma caused the plaintiff to become despondent, frustrated, hopeless, and irritated. Therefore, at or about 11:00am, he flooded his cell which flowed under the door and into the common area.

52.  The corrections officer on duty, Defendant Grant, immediately turned off the water to the cell and effectively neutralized the situation. Naturally, the flooding ceased.

53. At or about 11:30am the captain, Defendant Chevalier, arrived at the cell and informed the plaintiff that he was going to be subjected to a four-point restraint as punishment for having flooded the cell.

54. A four-point restraint system serves no legitimate medical, safety, or penological purpose or interest and is a barbaric device whereon a person is laid out face-up on a flat, hard, often metal, surface with their wrists and ankles firmly fastened to the four corners with metal handcuffs, leg irons, or straps in such a way as to cause extreme physical discomfort, grief, and pain. It is an over-glorified instrument of torture having or being of the fundamental nature or quality of purpose and design solely intended to inflict extreme physical and psychological anguish, pain, suffering, and torment upon its victims. It is a more modern or "contemporary" form of the medieval "Rack" except that it only violently strains the victim's extremities and doesn't stretch them.

55. It was/is extremely excessive, cruel, and unusual punishment for the circumstances.

56. The plaintiff protested such cruel and unusual punishment and assured Defendant Chevalier that he would not disrupt the peaceful and orderly operations of the facility any further and could not flood it again even if he had wanted to. The water was still shut off.

57. The plaintiff had already ceased his disruptive behavior, had begun to recompose himself, and had apologized to Defendants Chevalier and McClain for his actions and assured them that it would not happen again.

58. The plaintiff indicated that his actions were triggered by the extreme anguish, distress, hopelessness and humiliation he was feeling from the degradingly-invasive and gratuitous strip-search that he had just been subjected to and what he believed was the gross inequity of his current situation that was further exacerbated because he knew he hadn't done anything wrong but no one would take him seriously or even listen to him.

59. Such effusive psychological distresses are reasonably-well-known to cause acute, extended, and potentially-permanent serious losses or impairments of the function of the brain, adrenal glands, and other bodily organs and other such serious physical injuries that are typically manifest in fight, flight, or freeze behaviors that are ordinarily

uncharacteristic of the person's usual persona and serve as indicators that should alert properly trained and experienced corrections . . . employees . . . officers etc. and especially "mental health professionals" to such distresses and guide them in the de-escalation of the situation by talking or rather listening them down instead of escalating or otherwise exacerbating the situation with more undue physical force, disorder, and mayhem.

60.  The plaintiff pleaded in earnest with and attempted to appeal to any sense of charity, equity, or grace Defendants Chevalier and McClain might have and implored them not to subject him to such undue torture as he was already suffering from anxiety and depression.

61.  Defendant Chevalier told the plaintiff that he "could care less that [the plaintiff] was depressed and that now [the plaintiff] must pay for what [he] had done".

62.  The plaintiff again pleaded for mercy and assured them he would not cause any trouble and went and sat on the bed.

63.  Defendant McClain told the plaintiff that he "should have thought about that a half an hour ago before [the plaintiff] acted out."

64.  Defendants Chevalier and McClain had already secured the voluntary cooperation, control, and compliance of the plaintiff through verbal intervention. The plaintiff had already been starting to recompose himself before they had arrived and the mere threat of such unreasonably and inappropriately cruel and unusual torture had sufficiently ensured it.

65.  The plaintiff did not pose an immediate threat to staff, himself, others, or the safety and security of the facility and was secure in a cell in the RHU. No further physical force or immediate actions were warranted or necessary.

66.  It is readily-obvious to the eye or mind of an honest, impartial, and reasonable person who possesses ordinary good sense, intelligence, and judgment that Defendants Chevalier and McClain planned for the use of the four-point,

full stationary restraint against the plaintiff solely as a means or method of harassment, retaliation, or punishment against him for, among other things, having complained about the hazardous conditions of confinement --- i.e. arsenic in the water, his leaky cell, etc. --- which was the first in a series of steps or a progression of a series of events that are/were the direct, proximate, or sole cause of the current situation and for having flooded the cell which doesn't have much of a direct effect on them because it is cleaned by a "tier man" --- another inmate --- and not DOC staff .

67.   Defendants Chevalier and McClain ignored the plaintiff's ardent pleas for charity, equity, or grace and ordered him to the door to be handcuffed and brought to another cell, in essence and all actuality, to be subjected to further cruel and unusual punishment, torture and torment. The plaintiff remained seated on the bed.

68.   That there could be established, enacted, or enforced any such policy, practice, procedure, rule, or statute etc. requiring a natural person to cooperate with, voluntarily comply, or otherwise submit to the deprivation of their . . . inherent rights . . . especially by way of such cruel and unusual punishment, torture, or torment is repugnant to the very essence of the fundamental principles inherent in the Constitutions and is, for all intents and purposes, null and void of law, unenforceable, and inoperative.

69.   Defendants Chevalier and McClain again ordered the plaintiff to comply with their orders to come to the door and submit to being handcuffed and subjected to cruel and unusual punishments that, although appear allowable by the DOC's Directives, are well without and beyond the lawful bounds of what is objectively-reasonable and appropriate to the circumstances based on the accuracy, actuality, and truthfulness of the situation, the information in their possession at the time, and the information reasonably available under the circumstances, and that if he refused to "voluntarily" comply they would deploy a category-one chemical agent into the cell and physically force him to comply.

70.   The plaintiff pleaded with Defendants Chevalier and McClain that the four-point, stationary restraint was unreasonable, inappropriate, and totally unnecessary.

71. Defendants Chevalier and McClain became angry, irritated, and outraged with the plaintiff and called a "code" to summons mental health personnel to the plaintiff's cell under color of policy, practice, or procedure solely to help make their acts, errors, and omissions appear regular, valid, or routine and the plaintiff's noncompliance and unwillingness to be cruelly and unusually punished, tortured and tormented appear unreasonable and a punishable offense.

72. Defendant Melissa Winiarz, a licensed clinical social worker, who, by virtue of her education, credentials, and experience is permitted by law to evaluate and care for the mental health needs of inmates, responded to the code.

73. Prior to attempting to speak with or evaluate the plaintiff's mental health or his perception of the situation, Defendant Winiarz was pulled aside by Defendant Chevalier and provided with his version of events.

74. Defendant Winiarz wantonly, recklessly, or maliciously and at all times willfully refused, neglected, or otherwise failed to properly assess the totality of the facts, circumstances, and Directives surrounding the situation in order to effectively evaluate the plaintiff's physical and psychological condition through careful observation and systematic inquiry, the warranting of such planned use of the four-point, full stationary restraint, or to exercise her authority to intervene and determine and direct an appropriate, reasonable, and equitable resolution without the use of such physical force whenever possible. This situation clearly called for or was "ripe" for such a non-violent resolution.

75. The immediate and conspicuous facts being as they were --- that the plaintiff was at present reasonably calm, collected, and effectively recomposed and there was no discernible immediate or imminent threat to staff, the plaintiff, other inmates, or to the safety and security of the facility and by virtue of her education, credentials and experience that, by state law, permit her to evaluate and care for the mental health needs of inmates --- it should have been obvious to the eye or mind of Defendant Winiarz that the planned use of four-point, full stationary restraint was not reasonably necessary or required, served no identifiable, justifiable, or otherwise legitimate penological, medical, or psychological purpose, interests, or objective  would inevitably inflict undue serious physical injury, grief, and pain upon the plaintiff  and was solely intended as revenge, retaliation, or punishment against the plaintiff

for past "errors" as perceived by the DOC's staff but that, in all actuality, was because the plaintiff had exercised or had attempted to exercise his . . . inherent rights . . . to adequately and reasonably safe and sanitary conditions of confinement.

76.  Defendant Winiarz wantonly . . . joined in partnership in official lawlessness with Defendants Chevalier and McClain and attempted to delude the plaintiff into accepting the deprivations . . . of his . . . inherent rights . . . and the cruel and unusual punishment as an inevitable, ordinary, or routine action and one of the steps reasonably necessary or required by the Administrative Directives as an ordinary course of consequences or part of the progression of usual and routine events in the performance of their official duties and instead of assessing and evaluating the accuracy, actuality, or truthfulness of the totality of facts, circumstances, and Directives surrounding the situation, further antagonized and taunted the plaintiff by parroting the same question over and over as to whether he was going to cooperate and effectively agree to being subjected to such cruel and unusual torture and torment, clearly indicating she was not an impartial or neutral party and was there to do the bidding of Defendants Chevalier and McClain.

77.  Defendant Winiarz did not possess the knowledge, special skills, training and experience as is reasonably necessary and required to accurately and effectively identify, gain the trust of, and encourage open communication with a person who is suffering from such apparent anguish, anxiety, and emotional distress and was therefore unsuccessful in her attempts to communicate with the plaintiff by trying to order him to the door and even though the plaintiff gave her the information she needed --- i.e. that he was too distressed because "they set him up" and intimated that he didn't trust her --- she missed her opportunity to prevent further serious physical injury and arrive at a mutually acceptable nonviolent resolution for all involved.

78.  Having anticipated Defendant Winiarz's failure, Defendant Chevalier had already been at the ready with a handheld chemical agent device --- i.e., a can of mace --- and again threatened plaintiff with its use if he didn't comply.

79.  Plaintiff informed Defendant Chevalier that he is asthmatic.

80. Defendant Chevalier retorted that "It doesn't matter that [the plaintiff] is asthmatic" and that "if he doesn't cooperate, he would deploy it into the cell" and, without hesitation, he deliberately sprayed it directly into the plaintiff's face.

81. There were no exigent circumstances requiring the use of such category-one chemical agent and the plaintiff wasn't given a reasonable opportunity to comply after such warning.

82. Defendant Chevalier, having the responsibilities of a supervisory position --- i.e., captain --- was not authorized to exercise such use of force given the present circumstances and, if such physical force actually was reasonably necessary or required, should have directed another officer in the use of such otherwise clearly unwarranted physical force. Had he followed the Administrative Directives surrounding the use of physical force more closely, this situation would, most likely, have been diverted.

83. The plaintiff immediately succumbed to the force and effect of the noxious chemical agent and displayed symptoms of serious physical injury and began to choke, cough, gasp for air, sneeze, and vomit.

84. The plaintiff's face, neck, and eyes were burning from having such an unreasonably-excessive amount of the noxious chemical agent sprayed directly into his face.

85. Being that the water was still shut off in the cell, the plaintiff had no choice but to attempt to wash the chemical agent off his face with the water from the dirty toilet. He cupped the water in his hands and splashed it up to his face.

86. Defendant Chevalier then began falsely accusing the plaintiff of trying to assault him with the water from the toilet, and again sprayed the plaintiff directly in his face.

87. Although he was effectively chemically blind at the moment, the plaintiff believes, with an absolute or

reasonable degree of moral and legal certainty, that Defendant McClain also sprayed the plaintiff with a noxious chemical agent directly into his face at the same time.

88.   Upon being effectively immobilized and blinded by being sprayed directly in the face with a noxious chemical agent, multiple times, the plaintiff was bum-rushed by Defendants Chevalier, McClain, Clayton, Grant, Garutti, Quinones, and Torres shackled, and handcuffed me with my hands behind my back.

89.   Although the plaintiff had neither spit at nor attempted to spit at anyone, a spit veil or netting was pulled over his face and head.

90.   Fully shackled, the plaintiff was forcibly shuffled to the showers under the pretense of being decontaminated.

91.   The plaintiff was physically forced into the shower fully restrained, fully clothed, and with the shower fully restrained, fully clothed, and with the spit veil still covering his face and head effectively accelerating, exacerbating, and further dispersing the effects of the noxious chemical agent over more of his body including his chest, back, genitals, and surrounding areas.

92.   The noxious chemical agent is oil-based or otherwise not water soluble and requires soap or some other neutralizing agent to effectively remove it or alleviate its injurious, anguish inducing, and painful effects.

93.   Without removing the spit veil, Defendant Grant physically forced the plaintiff's head under the water just long enough to get it wet which, not only did it not remove any of the noxious chemical agent or soothe any of its effects, it made it even more difficult and painful for the plaintiff to breathe.

94.   The inherently ineffective "decontamination shower" provided no relief and instead heightened the plaintiff's sensitivity of his body's reactions to the noxious chemical agents and was performed merely as a deliberate histrionic display for the cameras and to provide for a check in a box for the fabrication of records and reports describing the events and procedures they seemingly followed.

95.  The plaintiff was forcibly shuffled to the infirmary by the aforementioned defendants and while still covered with the noxious chemical agent, the spit veil, and now-soaking-wet and contaminated clothes, he was physically forced into room #2 and strapped down on the four-point, full stationary restraint system as punishment for, among other things, having attempted to exercise his . . . inherent rights . . . and for flooding his cell.

96.  Fully aware of the of the readily-obvious and serious physical injuries, grief, and pain the plaintiff was clearly suffering from, Defendants Chevalier, McClain, Clayton, Grant, Garutti, Quinones, and Torres wantonly, recklessly, or maliciously and at all times willfully refused, neglected, or otherwise failed to provide even the most minimal level of care, compassion, or medical attention as was appropriate and reasonable for the circumstances according to the DOC's Directives and the contemporary standards or societal norms concerning common human decency in the eyes and mind of an objectively-reasonable, humane person who possesses ordinary good sense, intelligence, and judgment. However, instead of providing him an adequate opportunity for an effective decontamination shower and clean uncontaminated clothes as is reasonably necessary and required by law and common human decency: They callously ridiculed, razzed, and laughed the plaintiff mocking him about the very conditions, grief, and pain he was suffering from.

97.  The plaintiff pleaded for mercy and relief from the torture and torment he was suffering from the harmful and painful effects of the noxious chemical agent for more than two hours while he was strapped onto the four-point, full stationary restraint system.

98.  The plaintiff begged each new person who became aware of his obvious pain and torment to allow him even a moment of respite to wash off the noxious chemical agent and change into clean, uncontaminated clothes.

99.  Even such new people like Tiffany Dyke, a Registered Nurse, and Corrections Officer Shires --- Defendants Dyke and Shires --- wantonly . . . refused . . . to provide even the slightest little bit of care, compassion, or medical attention as was appropriate and reasonable for the circumstances and as is reasonably necessary and required by law and common human decency . . . .

100.  At no time during the ongoing progression of this event was the plaintiff afforded a reasonably-adequate opportunity to effectively remove the noxious chemical agent from his eyes, face, or body or remove his contaminated clothes and was wantonly . . . subjected to the injurious, grievous, and painful effects of such noxious materials for a degree of duration well without and beyond the lawful bounds of what was reasonably necessary or required to achieve its authorized objectives.

101.  Being that the objective for the use of the noxious chemical agent was to physically compel the plaintiff to cooperate and comply with the deprivation . . . of his . . . inherent rights . . . and submit to the undue and extreme torture and torment of such cruel and unusual punishment --- for an act, event, or behavior that had long since ceased --- in direct violation of such rights thereof, the use of such noxious chemical agents was not authorized and should have been removed and treated immediately.

102.  Suffering such extreme, unbearable pain and anguish from the torture and torment of the noxious chemical agent and the four-point, full stationary restraint system and the utter despair from being ignored or jeered at by everyone who could, should or otherwise had a professional or other lawful duty to respond to the plaintiff's obvious trauma and distress, the plaintiff, consumed by desperation, attempted to remove the contaminated clothes himself.

103. After much effort, the plaintiff was eventually able to wriggle and wrest his left hand free from the restraint.

104. Almost immediately upon freeing his left hand, the plaintiff was bum-rushed by Defendants Clayton, Shires, Ware, and John Doe ## 1 and 2.

105. Defendants Clayton, Shires, Ware, and John Doe ## 1 and 2 wantonly, recklessly, or maliciously and at all times willfully refused, neglected, or otherwise failed to act or respond in a professional or sensible manner as was appropriate and reasonable for the circumstances based on the situation and according to the DOC's Directives and the contemporary standards or societal norms concerning common human decency in the eyes and mind of an objectively-reasonable, humane person who possesses ordinary good sense, intelligence, and judgment and, absent

the prudence and self-control of such a . . . reasonable person . . . , descended into acts of madness and mayhem for their own amusement, excitement, merriment, or frolic and folly.

106.  Defendant Ware immediately secured the plaintiff's free hand, pressing it into the surface of the restraint system with all his strength and weight, while Defendants Clayton, Shires, and Doe #1 and #2 pummeled the plaintiff, repeatedly striking him with closed fists and all their might about his readily accessible, openly exposed, unprotected, and defenseless head, chest and ribs.

107.  At all times during the unlawful assault and battery the plaintiff was effectively secured to the four-point, full stationary restraint system and there was never any immediate or otherwise imminent threat of injury or harm to any staff, himself, other inmates, or the safety and security of the facility by the plaintiff or any remote possibility of his escape.

108.  As a direct result of the trauma inflicted upon him by the unlawful assault and battery the plaintiff suffered serious physical injuries, agonizing mental anguish, and excruciating pain.

109.  When the plaintiff was eventually released from the four-point, full stationary restraint system and returned to the RHU, he was finally able to remove some of the noxious chemical agent and was provided with clean clothes.

110.  The Defendants wantonly . . . refused . . .to acknowledge or report their actions or provide the plaintiff with any medical attention or treatment for his obvious and serious physical injuries, agonizing mental anguish, and excruciating pain as was reasonable and appropriate to the circumstances based on the situation . . . . and the information reasonably available to them under such circumstances and their direct knowledge of, among other things, the severe beating they gave him.

111.  The plaintiff reported the assault and battery to Defendant Dyke, the registered nurse on duty at the time, but because the officers hadn't made a report as required and "never told [her] that any such incident took place," she dismissed the plaintiff's request for help and wantonly, recklessly, or maliciously and at all times willfully subjected

the plaintiff to the deprivation . . . of his . . . inherent rights . . . and refused, neglected, or otherwise failed to render

medical attention as was reasonable and appropriate to the circumstances based on the situation . . . . and the

information reasonably available to her under such circumstances.


112.  Even though the plaintiff had been released from the four-point, full stationary restraint system, returned to the

RHU, and had been allowed to clean himself a bit: the Defendants wantonly . . . refused . . . to allow the plaintiff to

keep a scheduled legal visit In order to prevent anyone from witnessing the plaintiff's fresh injuries he received from

their wrongdoing, and thereby subjected him to the deprivation . . . of his . . . inherent rights . . . and to meaningful

access to the courts.


113.  When the plaintiff awoke on Sept. 14, 2021, he was in such extreme, excruciating pain from his serious

physical injuries he could barely move and couldn't get out of bed.


114.  The plaintiff's head, chest, and ribs were covered with bruises and contusions that were plainly and painfully-

obvious. Clear evidence of the unlawful beating he received from the Defendants on the previous day.


115.  Due to the serious physical injuries, agonizing mental anguish, and excruciating physical and psychological

pain he was experiencing as a direct and proximate result of the malevolence and malfeasance of the Defendants and

the torment, torture, false accusations, the deprivations of his rights, humiliation, and other mistreatment and

vindictively cruel and unusual punishments he was subjected to by them: The plaintiff became despondent,

overwhelmed with feelings of hopelessness, and consumed by despair and started having thoughts of suicide.


116.  The plaintiff informed Defendants Winiarz, Dyke, and Gaw, the DOC's social worker, registered nurse, and

psychologist who, by virtue of their education, credentials, and experience are permitted by State law to evaluate

and care for the mental health needs of inmates, of his suicidal feelings and intentions.


117.  Defendants Dyke, Winiarz, and Gaw wantonly . . . refused neglected, or otherwise failed to act or respond in a

professional or sensible manner and take the plaintiff's expressions of his feelings or intentions seriously and render

immediate medical attention or other form of intervention as was appropriate and reasonable for the circumstances based on the situation and according to ordinary medical or psychiatric standards and the DOC's Directives . . . and the information reasonably available to them under such circumstances. They fabricated records falsely declaring that the plaintiff "was fine" when they knew, or reasonably should have known, indeed, he wasn't.

118. Defendant Gaw, the facility psychologist, actually had the ignorance and audacity to outright challenge the plaintiff to "prove to [her] that he is, in fact, suicidal.

119. Later that afternoon --- Sept. 14, 2021 --- overcome by the Defendants' continual inflictions of antagonistic, physical, and psychological abuse, his serious physical injuries, agonizing mental anguish, and excruciating physical and psychological pain: the plaintiff succumbed to his despair and did attempt to commit suicide by swallowing three (3) sharp metal objects he found lying around his RHU cell.

120. The plaintiff informed the correctional officer who was on duty at the time that he had found and swallowed said sharp objects in an attempt to commit suicide. The officer wantonly . . . refused, neglected, or otherwise failed to act or respond in a professional or sensible manner and take the plaintiff's expressions of his feelings or actions seriously and render immediate medical attention or other form of intervention as was appropriate and reasonable for the circumstances based on the situation and according to ordinary good sense, intelligence, and judgment, the DOC's Directives . . . and the information reasonably available to him under such circumstances.

121. As a matter of policy, by reason of the feelings of anguish, despair, and despondency that, as an inherent part of human nature, are reasonably-well-known to be common among inmates who are subjected to the punishment of isolation or segregation in the Restrictive Housing Unit, especially following what should reasonably be perceived by an ordinary observer or layperson as a traumatic event, the officers tour the block or "make rounds" every ten (10) or fifteen (15) minutes as a measure specifically intended to prevent suicides and other types of self-harm of the presumably anxious, distressed, despondent, or otherwise vulnerable population.

122. On the following day ---Sept. 15, 2021 --- the plaintiff was suffering from chronic, excruciating abdominal

pain as such metal objects attempted to make their way through the plaintiff's digestive system.

123.  The plaintiff reported his pain and the circumstances of the situation to the officer on duty.

124.  The officer on duty responded in a professional or sensible manner and took the plaintiff's expressions of his feelings and alleged actions seriously and provided for immediate medical attention as was appropriate and reasonable for the circumstances based on the situation and according to ordinary good sense, intelligence, and judgment, the DOC's Directives . . . and the information reasonably available to him under such circumstances.

125.  The plaintiff was brought to the infirmary to have X-rays taken of his abdominal region.

126.  While the X-rays were being taken, the plaintiff reported the unlawful assault and battery to the radiologist and showed her the bruises and contusions.

127.  The radiologist, being a supposedly-independent medical professional, wantonly . . . and . . . willfully refused, neglected, or otherwise failed to act or respond in a professional or sensible manner and take the plaintiff's report and request for help seriously and render immediate medical attention or other form of intervention or even file a report as was appropriate and reasonable for the circumstances based on the situation and according to ordinary good sense, intelligence, and judgment, medical standards . . . state law, and the information reasonably available to her under such circumstances.

128.  The plaintiff is a ward of the State who reported and offered evidence reasonably sufficient to cause, compel, or otherwise mandate her to report the plaintiff's allegations of physical or other abuse at the hands of his guardians to her superiors or an otherwise proper authority.

129.  Instead, the radiologist insisted she was only there to take the X-rays and the plaintiff "needed to take that issue up with the medical staff," who had already been informed and . . . willfully refused . . . to act . . . .

130.  Immediately upon completion of the X-rays, the plaintiff was returned to the same cell in the RHU where he found the metal objects he swallowed.

131.  The cell had not been cleaned, searched, or otherwise "shaken down" for the presence of any more metal objects or other harmful items.

132.  At all times relevant, the Defendants wantonly . . . and . . . willfully refused . . . to take the plaintiff's expressions of his feelings, actions, or intentions seriously and render immediate psychiatric or psychological attention or other form of intervention or mental health evaluation or care as was appropriate and reasonable for the circumstances based on the situation and according to ordinary good sense, intelligence, and judgment or medical or psychiatric standards and the DOC's Directives . . . and the information reasonably available to them under such circumstances.

133. The State of Connecticut and the Department of Corrections as ongoing entities comprised of a regularly interacting or interdependent sets of persons combined as to form and function as a unified whole irrespective of their individual identities, that together perform one or more vital functions reasonably necessary and required in order more effectually to define, secure, and perpetuate the liberties, rights, and privileges of each person to each person have both wantonly . . . and . . . willfully refused, neglected, or otherwise failed in their constitutionally imposed duties to establish and set forth, by particularly describing with clarity and precision of expression, the circumstances under which correctional staff are authorized to use physical force or deadly physical force within the lawful bounds of the Constitutions while in the performance of their duties and equally as, if not more importantly, the degree and duration of such physical force as reasonably necessary or required and, indeed, at what point it should cease and desist because it no longer serves a legitimate penological objective or interest and has crossed over into corporeal or cruel and unusual punishment.

134.  From Sept. 15, 2021, through Sept. 28, 2021, and at all times relevant hereto, despite numerous X-ray confirmations that the plaintiff, indeed, had swallowed three (3) metal objects in an attempt to commit suicide, and that the plaintiff displayed symptoms of excruciating physical pain and psychological distress and repeatedly

reported and expressed these conditions, both physically and verbally, to the DOC's medical staff, including Defendants Dyke, Wiriarz, and Gaw who, by virtue of their education . . . are expected to know the urgency of such need for immediate, emergency medical treatment, they wantonly . . . and . . . willfully . . . refused . . . to have the plaintiff examined or evaluated at an outside, otherwise independent hospital or other properly equipped and staffed medical facility capable of providing the necessary and required treatment, until his condition advanced to such a degree of impending demise or irreparable injury.

135.  The State of Connecticut and the Department of Corrections as ongoing entities comprised of regularly interacting or interdependent sets of persons combined as to form and function as a unified whole . . . willfully failed to establish, enact, and enforce through proper legislation, rulemaking, "Administrative Directives" and oversight etc. a reliable system of policies, practices, and procedures that mandates and automatically compels State agents . . . employees . . . officers etc. to provide psychiatric or psychological attention, evaluation, and care to an inmate in any circumstances or situations when, as reasonably perceived in the eyes or mind of the inmate, a traumatic event or incident occurs involving, among other things, physical force and especially the use of the four-point, full stationary restraint system or any other such acts, errors, or omissions that have the potential to cause distress in an individual and possibly interfere with their cognition or ability to otherwise function effectively in body or mind.

136.  At all times relevant hereto, even after it was clearly established that the plaintiff had suicidal ideations and indeed, did attempt to commit suicide, the plaintiff never received any type of psychiatric or psychological care as was appropriate and reasonable for the circumstances based on the situation . . . .

137.  At all times relevant hereto, any, all, or every Defendant not otherwise particularly described herein as having directly participated in the madness and mayhem of the circumstances surrounding the situation, undue physical force, violence, etc.: had knowledge of such wrongful government misconduct and having the power to prevent or aid in the preventing of the commission of such acts, errors, or omissions, wantonly . . . and . . . willfully refused . . . to do so or aided in the covering up or concealing such unlawful government misconduct by misleading conduct such as knowingly making a false statement or intentionally omitting information from a statement and thereby causing a portion of the statement to be misleading  or intentionally concealing a material fact, and thereby creating

a false impression by such statement  or with intent to mislead, knowingly submitted or invited reliance on a writing

or recording that is false, forged, altered, or otherwise lacking in authenticity  or knowingly submitted, or invited

reliance on evidence such as an item, sample, specimen, map, photograph, Administrative Directives, statute, law or

other object that is misleading in a material respect  or knowingly used an artifice, device, scheme or other trick or

tampered with, obstructed, interfered with, or otherwise delayed legal mail or access to counsel and willfully

subjected this plaintiff to the deprivation of his . . .  inherent rights . . . to petition those vested with the powers of

government for a redress of grievances and effectively obstructed or interfered with and otherwise deprived him of a

reasonably adequate opportunity to efficiently and effectively prepare and prosecute this or any other case or official

proceedings that were pending or about to be instituted, and denied him due process and equal protection of the law

and meaningful access to the courts, and thereby, under color of law, office, or badge of authority, willfully subjected

the plaintiff to the deprivation of the free exercise or enjoyment of any of his inalienable, indefeasible, and inherent

rights, privileges, or immunities guaranteed, protected, or secured to him by the Constitution for the United States

and of the State of Connecticut.


# INJURIES

## Bodily and Personal Injuries

1. The plaintiff was inflicted with serious physical injuries whereby he suffered serious loss or impairment of the function of his eyes, lungs, faculties of his mind --- i.e. brain --- and other bodily organs, agonizing mental anguish, and excruciating physical and psychological pain from being dowsed repeatedly about the eyes, face, and neck with a noxious chemical agent having or being of the fundamental nature or quality of purpose and design intended to inflict maximum pain, discomfort, and irritation upon those exposed and immediately disable them by way of a severe burning and stinging sensations through contact with the eyes, skin, and mucous membranes, ingestion, and inhalation and was wantonly . . . and . . . willfully exposed to such noxious chemical agent for a degree of duration longer than two (2) hours. A duration longer than reasonably necessary or required to serve any legitimate penological or otherwise lawful objective and exponentially longer than the manufacturer's recommendation for immediate removal upon exposure.

2. While still enveloped or otherwise consumed by said noxious chemical agent the plaintiff was further inflicted with serious physical injuries whereby, he suffered serious loss or impairment of the function of his arms, legs, faculties of his mind --- i.e., brain --- and other bodily organs from the agonizing mental anguish and excruciating physical and psychological pain he experienced from being strapped onto a four-point, full stationary restraint system. A barbaric instrument of torture having or being of the fundamental nature or quality of purpose and design intended to cause intense suffering through the infliction of severe physical pain and overall anguish of body and mind by effectively immobilizing a person on a hard rigid surface by way of strapping or otherwise firmly securing a person's arms and legs to said surface in a manner that prevents all movement and strains the muscles and ligaments as a form of punishment or coercion and serves no legitimate medical, penological, or psychological objective or interest. The plaintiff was wantonly . . . and . . . willfully subjected to such immediate torture and torment for a degree of duration longer than two (2) hours solely as punishment, retaliation, and revenge.

3.  Occurring simultaneously with the serious physical injuries the plaintiff was already inflicted with as identified in ##1 and 2,  the plaintiff was further inflicted with serious physical injuries whereby, while he was still affected by said noxious chemical agent and fully stationary or immobilized and restrained, the plaintiff was pummeled and severely beaten by the Defendants and suffered agonizing mental anguish, excruciating physical and psychological pain, and serious loss or impairment of the functions of his bodily organs, overall mobility, ability to rest etc. from the bruises, contusions, inflammation, swelling, and lesions he received.

4.  While the excruciating pain the plaintiff suffered in his head, chest, and ribs and around the muscles in his arms and legs effectively diminished after ten (10) weeks or so, the psychological anguish and stresses of the traumatic ordeal are, at present, everlasting and perpetuate the serious loss or impairment of the function of the faculties of his mind --- I.e. his brain --- and other bodily organs and are manifest by extreme anguish, anxiety, depression, despondency, frustration, paranoia, and overall cognitive and motor functions --- i.e. lethargy, dizziness, debilitating headaches, forgetfulness, hypersensitivity, sleep deprivation, etc.

5.  Furthermore, In light of the fact that the infinitely degrading, humiliating, and sordid "strip search" was performed absent any type of due process and was based upon knowingly false pretenses and criminally tampered with or fabricated physical evidence, it constitutes as voyeurism: aggravated sexual abuse of the plaintiff.

Deprivation Of Rights Irreparable Injuries

6.  While acting under color of law, office, or badge of authority, etc. the Defendants wantonly, recklessly, or maliciously and at all times willfully subjected or caused the plaintiff to be subjected to the deprivation of the free exercise or enjoyment of any of his inalienable, indefeasible, and inherent rights, privileges, or immunities guaranteed, protected or secured to him by the Constitution for the United States and of the State of Connecticut with the use of undue physical force and violence and thereby inflicted such injuries, to wit:

Article I of the ATTCOTUS
a.  The plaintiff was retaliated against and punished for having exercised his right to petition the government (DOC) for a redress of grievances concerning the unsafe, unsanitary, unhygienic, and inhumane conditions of confinement in his cell. By having to exhaust all of the Administrative Directives' "remedies" to get a leak in his cell repaired, and for having discussed the possibility of bringing a lawsuit against the DOC for his exposure to arsenic in the water system with other inmates in the block and with his mother via a recorded and monitored, inmate phone system, he was thus "regarded as" a "complainer" by the Defendants and was treated with animosity and punished for exercising his . . . inherent rights . . . to such reasonable redress.

Article IV of the ATTCOTUS
b.  The plaintiff was deprived . . . of his . . . inherent right . . . to be secure in his person, house, papers, and effects against unreasonable searches and seizures . . . when he was seized in his person based on things ("contraband") that, unreasonably, were first procured, placed, or "planted" by and then seized by the Defendants.

Article V of the ATTCOTUS
c.  The plaintiff was deprived . . . of his . . . inherent rights . . . to his liberty and property, in whatever minute pittance it existed, without the due process of law but in accordance with the DOC's unconstitutional Administrative Directives.

Article VI of the ATTCOTUS
d.  The plaintiff, for all intents and purposes, was in essence instantly prosecuted, convicted, and punished for merely being accused of an alleged criminal offense while being deprived of anything even remotely resembling an equitable trial by an impartial "jury"  was not adequately apprised or informed of the nature and cause of the accusations  wasn't allowed to confront the " witnesses" against him  had no process for obtaining witnesses in his favor  and had no Assistance of Counsel for his defense. While it is reasonable that the DOC has jurisdiction over such a minor or petty offenses and it is not feasible to expect a full-on public jury trial, the inmates should have some sort of independent representation and the DOC's administrative procedures should provide for a more constitutionally-equitable process that protects the . . . inherent rights . . . of the inmates when being so "prosecuted" for an offense.

Article VIII of the ATTCOTUS
e. The plaintiff repeatedly suffered injury, grief, and pain from the deplorable conditions of confinement including the inhabitability of his living space, unconstitutional policies, practices, and procedures that facilitated such cruel and unusually punishing conditions and led to and are the direct and proximate cause of the unlawful assaults and battery.

Article XIV of the ATTCOTUS
f. The State of Connecticut and the DOC as an ordinary course of business have enforced unconstitutional laws and Administrative Directives that have repeatedly deprived or diminished in duration or extent the privileges or immunities of the plaintiff and have thereby deprived him of the already infinites and a little bit of liberty and property he possessed, without the due process of law and deprived him of the equal protection of the law.

## **PRAYER FOR RELIEF**

Wherefore, plaintiff demands judgment against all Defendants in their individual and official capacities for declaratory and injunctive relief, compensatory and punitive damages, costs, reasonable attorneys' fees and other remedies or relief which the Court demands and so orders as equitable and appropriate, including:

1. A declaration that the Defendants deprived the plaintiff of the free exercise or enjoyment of his . . . inherent rights . . . under color of law and a mandating injunction for equitable relief wherefore there is no adequate remedy at law, whereby it is so ordered, among other things, that the State of Connecticut Executive, Legislative, and Judicial offices and the Connecticut Department of Corrections cease and desist with their "hands off" attitude and approach to prison mismanagement and change their customs, policies, statutes, and Administrative Directives to ensure safe, sane, and sanitary conditions of confinement exist for all inmates at all times, that inmates be provided with a more equitable and constitutional system of Administrative Remedies whereby punishment doesn't precede the process . . . and that there is inmate and public participation in the restructuring of "the system."

2. Plaintiff petitions the court for declaratory judgment to particularly describe with clarity and precision of expression precisely where in the letter of the United States or Connecticut Constitutions it establishes and ordains the authority of the State of Connecticut its agencies . . . departments . . . offices, etc., to establish, enact, or enforce intentionally vague, ambiguous and arbitrary policies, practices, rules, statutes that are repugnant to the essence and letter of the fundamental principles inherent in the Constitutions.

3. Plaintiff petitions the court for declaratory judgment to so order the State . . . to produce evidence of the constitutional authority it claims, exercises, or otherwise usurps to engage in such inherently arbitrary, vague, and oppressive rule making and to establish, enact, or enforce unconstitutional legislation and that these customs, practices, etc. aren't a violation of the Public Trust and a glaring misconstruction or abuse of its powers according essence, spirit, and letter of the fundamental principles inherent in the Constitutions.

4. Plaintiff petitions the court for declaratory judgment to so order the State . . . to produce evidence of and particularly describe with clarity and precision of expression precisely where in the letter of the United States or Connecticut Constitutions it so establishes and ordains the authority the State . . . so claims, exercises, or otherwise usurps to entitle itself, certain persons, or sets of persons to exclusive public emoluments and privileges from the community and bestow sovereignty and immunity upon themselves, their agents . . . elected officials, employees . . . officers, etc. to shield them from their mistakes, misconduct, or malfeasance and deprive the People of Connecticut of the free exercise or enjoyment of any of their . . . inherent rights . . . for a redress of grievances when the State . . . is the direct, proximate, or sole cause of such grievances.

5. Compensatory Damages

6. Statutory and punitive damages

7. Costs, incidentals, and reasonable attorneys', experts', and witness fees.

8. Such other further remedies or relief which the Court demands and so orders as equitable and appropriate.

Plaintiff will exercise his right to a trial by an impartial jury for all issues in this complaint so triable.

Plaintiff


# MEMORANDUM OF RIGHTS

Bill of Rights (actual text of official document)
The Conventions of a number of the States, having at the time of their adopting the Constitution, expressed a desire, in order to prevent misconstruction or abuse of its powers, that further declaratory and restrictive clauses should be added: And as extending the ground of public confidence in the Government, will best ensure the beneficent ends of its institution.

Article I
 Congress shall make no law . . . abridging (depriving or diminishing in duration, extent, or effect). . . the right of the people . . . to petition the Government for a redress of grievances.

Article IV
  The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searched and seizures shall not be violated, and no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Article V
  No person shall be . . . deprived of life, liberty, or property, without due process of law . . . .

Article VI
  In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation  to be confronted with the witnesses against him  to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.

Article VIII
Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

Article IX
The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.

Article X
The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

Article XI
The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against any one of the United States by Citizens OF ANOTHER STATE, or by Citizens or Subjects of any Foreign State.

Article XIII
  Section 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party has been
duly convicted, shall exist within the United States, or any place subject to their jurisdiction.
  Section 2. Congress shall have power to enforce this article by appropriate legislation.

Article XIV
  Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of
the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge
the privileges or immunities of citizens of the United States, nor shall any State deprive any person of life, liberty, or
property, without due process of law nor deny to any person within its jurisdiction the equal protection of the laws.

  Section 5. The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

## THE CONSTITUTION OF [SIC] THE STATE OF CONNECTICUT

## ARTICLE FIRST

## DECLARATION OF RIGHTS

That the great and essential principles of liberty and free government may be recognized and established.

Sec. 1.  All men when they form a social compact (i.e., this Constitution), are equal in rights and no [person] or set
of [persons] are entitled to exclusive public emoluments or privileges from the community.

  Sec.  2.  All political power is inherent in the people, and all free governments are founded on their authority, and
instituted for their benefit and they have at all times an undeniable and indefeasible right to alter their form of
government in such a manner as they may think expedient.

  Sec. 7.  The people shall be secure in their persons houses, papers and possessions from unreasonable searches or
seizures and no warrant to search any place, or to seize any person of things shall issue without describing them as
nearly as may be, nor without probable cause supported by oath or affirmation.

  Sec.  8.  /Article XVII of the Amendments to the Constitution of the State of Connecticut (ATTCOTSOC) In all
criminal prosecutions, the accused shall have the right to be heard by [themselves] and by counsel  to be informed of
that nature and cause of the accusation  to be confronted by the witnesses against [them]  to have compulsory
process to obtain witnesses in [their] behalf  to be released on bail upon sufficient security, except in capital
offenses, where the proof is evident and the presumption great  and in all prosecutions by information, to a speedy,
public trial by an impartial jury. No person shall be compelled to give evidence against [themself], nor be deprived
of life, liberty or property without due process of law, nor shall excessive bail be required nor excessive fines
imposed. . . .

  Sec. 9.  No person shall be arrested, detained or punished, except in cases clearly warranted by law.

  Sec. 10. All courts shall be open, and every person, for an injury done to him in his person, property or reputation,
shall have remedy by due course of law, and right and justice administered without sale, denial or delay.

  Sec.  14. The citizens have a right, in a peaceable manner, to assemble for their common good, and to apply to
those invested with the powers of government, for redress of grievances, or other proper purposes, by petition,
address or remonstrance.

Article Eleventh
  Sec. 4. Claims against the state shall be resolved in such a manner as may be provided by law.

Plaintiff

_____

Jose Garcia
Cheshire CI
900 Highland Ave
Cheshire, CT 06410